## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA,**
***for the use and benefit of***
**TIMBERLINE CONSTRUCTION**
**GROUP, LLC**

**CIVIL ACTION**

**VERSUS**

**NO. 24-669-JWD-EWD**

**APTIM FEDERAL SERVICES, LLC,**
**ET AL.**

### RULING AND ORDER

This matter comes before the Court on Timberline's *Motion for Summary Judgment* ("Timberline's *MSJ*") (Doc. 117) filed by Timberline Construction Group, LLC ("Timberline"). APTIM Federal Services, LLC ("APTIM") opposes the motion. (Doc. 133.) Timberline filed a reply. (Doc. 138.) APTIM filed a sur-reply. (Doc. 145.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Timberline's *MSJ* is denied.

## I.   RELEVANT BACKGROUND

### A.  Factual Background

Following Hurricane Ian, the United States Army Corps of Engineers ("USACE") undertook to build temporary housing ("the Project") in Lee County, Florida. (*Statement of Material Facts* ("*SMF*"), Doc. 117-1 at 1, ¶ 1.)[1] The Project was located on land owned by Habitat Harlem Heights, LLC ("Habitat"). (*Id.* at 1, ¶ 2.) The Federal Emergency Management Agency ("FEMA") leased this land from Habitat. (*Id.*; *see* Doc. 133-1 at 1–2, ¶ 2.) At all relevant times,

---

[1] Unless otherwise indicated (e.g., with a qualifying record citation), when the Court cites the *Statement of Material Facts*, APTIM has admitted the cited material. *See* M.D. La. Civ. R. 56(f).

the USACE owned/was responsible for the Project. (*See, e.g.*, Doc. 117-6 at 14 (Question: "[T]he entity that was in the role as owner for the [P]roject would have been the [USACE]?" Answer: "Correct.").) The USACE hired Brice Aptim JV, LLC ("BAJV") as general contractor. (Doc. 117-1 at 1, ¶ 1.) BAJV subcontracted work to its member APTIM. (*Id.* at 2, ¶ 4.) In turn, APTIM subcontracted work to Timberline. (*Id.* at 2, ¶ 7.)

The contract between the USACE and BAJV ("the Prime Contract") included a Federal Acquisition Regulations ("FAR") provision commonly known as the Permits and Responsibilities Clause. (*Id.* at 2, ¶¶ 5–6 (citing Doc. 117-3 at 170 (quoting 48 C.F.R. § 52.236–7)).) It reads:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. The Contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence. The Contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the contract.

48 C.F.R. § 52.236–7; *see also* Doc. 117-3 at 170 (quoting 48 C.F.R. § 52.236–7).

The subcontract between BAJV and APTIM contained several FAR "flow down" provisions, including the Permits and Responsibilities Clause. (Doc. 117-1 at 2, ¶ 5 (citing Doc. 117-7 at 198).) The subcontract between APTIM and Timberline ("the Timberline Subcontract") provided that, absent any state laws governing the Prime Contract, the subcontract was to be "governed by and interpreted pursuant to the rules and laws of the state in which the Prime Contract work [was] performed" (i.e., Florida). (*Id.* at 2–3, ¶ 8 (citing Doc. 117-8 at 23).) The Prime Contract provided only that "United States breach of contract law shall apply." (*Id.* at 3, ¶ 9 (citing Doc. 117-3 at 167).) The parties therefore agree that Florida law governs the Timberline Subcontract. (*See* Doc. 117-2 at 4 & n.1 (citing Doc. 28 at 9); *see generally* Docs. 117-2, 133 (analyzing and applying Florida law).)

2

### B.  Procedural Background

APTIM terminated the Timberline Subcontract on June 25, 2023. (*Id.* at 3, ¶ 10.) Timberline filed suit against APTIM in the Middle District of Florida on August 11, 2023. (*Id.* at 3, ¶ 12.) Then, on August 15, 2024, the Middle District of Florida transferred the case to this Court due to a forum-selection clause in the Timberline Subcontract. (*Id.* at 3, ¶ 13.) Shortly thereafter, APTIM filed a Counterclaim against Timberline, alleging fraud and breach of contract, both state law claims. (*Id.* at 3, ¶¶ 14–15.)

On May 16, 2025, APTIM responded to Timberline's Requests for Admission, acknowledging that APTIM was not a licensed contractor under Florida law. (*Id.* at 4, ¶ 18 (citing Doc. 117-9); *see also id.* at 4, ¶¶ 20–21 (citing Docs. 117-9, 117-10).) A search of the Florida Department of Business & Professional Regulation's website confirmed this admission. (*Id.* at 4, ¶ 19 (citing Doc. 117-10).) Thus, on May 22, 2025, Timberline moved to amend its Answer to APTIM's Counterclaim to include the affirmative defense that, because APTIM was not licensed under Florida law, its claims are barred pursuant to Florida Statutes § 489.128. (Doc. 106 at 1–2; *see also* Doc. 106-2 at 10–11 (citing Fla. Stat. § 489.128).)[2] On August 29, 2025, Timberline filed this *MSJ*, raising the same argument and seeking dismissal of APTIM's Counterclaim as well as several of its affirmative defenses to Timberline's Complaint. (Doc. 117 at 3.)

## II.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[2] The Magistrate Judge denied Timberline's motion on December 23, 2025, but that decision did not dispose of the instant motion. (*See* Doc. 147 at 4–11 (denying leave to amend under Federal Rule of Civil Procedure 16).)

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

"A movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." (emphasis in original))). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (quoting *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the movant bears its burden of showing that there is no genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations omitted) (quoting Fed. R. Civ. P. 56(e)). The nonmovant's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (cleaned up).

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the

evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

## III.   PARTIES' ARGUMENTS

### A.  Timberline's MSJ (Doc. 117)

Timberline first notes that any entity operating as a contractor in Florida must be so licensed under Florida law. (Doc. 117-2 at 7 (citing Fla. Stat. § 489.113(2)).) Per Florida Statutes § 489.128(1), "contracts entered into on or after October 1, 1990, by an unlicensed contractor shall be unenforceable in law or in equity by the unlicensed contractor." (*Id.* (quoting Fla. Stat. § 489.128(1)); *see also id.* (citing *Earth Trades, Inc. v. T & G Corp.*, 108 So. 3d 580, 586 (Fla. 2013); *Southpoint Shore Mgmt. LLC v. Homexpo Miami Corp.*, 415 So. 3d 744, 747 (Fla. 3d DCA 2025)).) An entity qualifies as unlicensed if, at the time of contracting, it "d[id] not have the license required for the scope of work being performed under the contract." (*Id.* (citing Fla. Stat. § 489.128(1)(a), (c)).) According to Timberline, APTIM was (and remains) unlicensed in Florida. (*Id.* (citing Docs. 117-9, 117-10).)

Timberline draws a parallel to *Earth Trades, Inc. v. T & G Corp.*, where the Florida Supreme Court held that "a subcontractor could not maintain a breach of contract claim against the general contractor because the subcontractor was unlicensed." (*Id.* at 7–8 (citing *Earth Trades*, 108 So. 3d at 586).) Timberline notes that, although the penalty of unenforceability "may be harsh, it is the one chosen by the Florida legislature to protect the interests of the citizens of the state as a matter of public policy." (*Id.* at 8; *see also id.* (citing 6 *Bruner & O'Connor on Construction Law* § 16:24 (2024)) (explaining that unenforceability is a common penalty).) Thus, Timberline

argues, APTIM cannot rely on the Timberline Subcontract for its Counterclaim or for its affirmative defenses to Timberline's Complaint. (*Id.* (citing, *inter alia*, Fla. Stat. § 489.128(1)).)

Second, Timberline observes that Florida Statutes § 489.103(8) exempts from Florida's licensing requirement "[a]ny construction, alteration, improvement, or repair carried on within the limits of any site the title to which is in the United States or with respect to which federal law supersedes th[e] [state law]." (*Id.* at 9 (quoting Fla. Stat. § 489.103(8)).) But Timberline denies that such exemptions apply here, because (1) the Project was located on *privately-owned* land, (*id.* (citing Doc. 117-5)), and (2) "federal law does not supersede Florida's contractor licensing law under these particular facts," (*id.*).

Timberline focuses on the second argument. It acknowledges the Supremacy Clause but points to the presumption against preemption. (*Id.* at 9–10 (citing, *inter alia*, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part)).) Given the presumption, courts must "examine the explicit statutory language and the structure and purpose of the [federal] statute." (*Id.* at 10 (quoting *Gade*, 505 U.S. at 96).) According to Timberline, "the purpose of the FAR is to promote efficiency, integrity, and sound business practices in federal acquisitions." (*Id.* (citing 48 C.F.R. §§ 1.101–102).) It is also to "deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives." (*Id.* at 10–11 (emphasis omitted) (quoting 48 C.F.R. § 1.102).) Lastly, Timberline notes that the FAR's Permits and Responsibilities Clause provides that contractors "shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws." (*Id.* at 11 (quoting 48 C.F.R. § 52.236–7).)

Given the above—especially the Permits and Responsibilities Clause—Timberline contends that the FAR does not preempt Florida's licensing law. (*Id.*) On the contrary, the two are in harmony, to such a degree that "a finding of preemption would actually *frustrate* Congress's purpose." (*Id.*; *see id.* at 11–12 (citing *Earth Trades*, 108 So. 3d at 586) (explaining the impetus for Florida Statutes § 489.128); *see also id.* at 13 (citing, *inter alia*, 48 C.F.R. §§ 9.103(c), 15.101–1).) Timberline asserts that FAR Sections 9.103 and 9.104–1 do not apply to subcontractors like APTIM. (*Id.* at 12.) Instead, under FAR Section 9.104–4, the prime contractor, not the federal government, "is responsible for determining the responsibility of its prospective subcontractors." (*Id.* at 12–13 (citing 48 C.F.R. § 9.104–4).) Timberline adds that, here, provisions concerning the determination of responsibility "are irrelevant," because the dispute is between private parties (i.e., subcontractor and sub-subcontractor) and involves state law. (*Id.* at 13.)

Next, Timberline denies that *Leslie Miller, Inc. v. Arkansas* "establish[es] a categorical prohibition on state licensing requirements for federal contractors, much less subcontractors." (*Id.* at 14 (citing *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956)).) In any event, Timberline says, *Leslie Miller* and its progeny are distinguishable in that such cases involved determinations of contractors' responsibility. (*Id.*) Specifically, in *Leslie Miller*, the Supreme Court found that, because Arkansas's licensing law was similar to the Armed Services Procurement Regulations' "responsibility" criteria, there was a risk that enforcement of the state law "would give the State's licensing board a virtual power of review over the *federal* determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting *the lowest responsible bidder*." (*Id.* at 14–15 (quoting *Leslie Miller*, 352 U.S. at 190).) *Leslie Miller* (1) "contained no discussion of the application of licensing laws to subcontractors" and (2) merely preempted a state law "prohibit[ing] unlicensed contractors from *bidding* on construction projects." (*Id.* at 15.)

Essentially, Timberline argues that *Gartrell Construction Inc. v. Aubry*—a Ninth Circuit decision relying heavily on *Leslie Miller*—is bad law. (*Id.* at 15 (citing *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 438–39 (9th Cir. 1991)) ("In its opinion, the Ninth Circuit abdicated its responsibility to perform an actual conflict preemption analysis . . . . [It] incorrectly treated *Leslie Miller* as if it had created a categorical rule that state contractor's licensing laws are always preempted by federal procurement laws."); *see also id.* at 15 n.3 (asserting that federal policy changed post-*Leslie Miller* and that "the *Gartrell* court erred in its comparison of the federal and state laws by failing to use the current federal policy as the basis for its analysis").) But regardless of whether *Gartrell* was rightly decided, Timberline contends that it is inapplicable because it concerned the *federal government's* determination of a contractor's responsibility, whereas the instant case involves private parties. (*Id.* at 15–16.)

Timberline also contends that *Gartrell*'s analysis of the Permits and Responsibilities Clause was "severely flawed" in that it (1) read too much into *Leslie Miller* and (2) rendered the clause superfluous. (*Id.* at 16 (citing *Gartrell*, 940 F.2d at 439).)[3] According to Timberline, "[a] better interpretation . . . is that the [federal] agency's pre-award responsibility determination and the contractor's post-award responsibilities under state law are separate matters." (*Id.* at 16–17 (quoting David S. Rubenstein, *State Regulation of Federal Contractors: Three Puzzles of Procurement Preemption*, 11 U.C. Irvine L. Rev. 207, 248 (2020)).) Timberline adds that, in *North Dakota v. United States*, the Supreme Court held that "federal contractors *can* be subject to state

---

[3] Timberline also indicated that it could not locate the version of the Permits and Responsibilities Clause referenced in *Gartrell*. (Doc. 117-2 at 16 n.4); *see Gartrell*, 940 F.2d at 440 (explaining that the Permits and Responsibilities Clause was more or less identical at the time when *Leslie Miller* was decided). This Court has located the 1951 version of the clause and has confirmed that the *Gartrell* court recited it correctly. *See* 32 C.F.R. § 596.531–1 (1951) ("11. *Permits and responsibility for work.* The contractor shall, without additional expense to the Government, obtain all required licenses and permits . . . .").

regulations, even if the regulations increase the price charged to the federal government." (*Id.* at 17 (citing *North Dakota v. United States*, 495 U.S. 423, 439–44 (1990)).)

Timberline seeks to distinguish additional cases. Specifically, it argues that *United States ex rel. DLM Development Group, Inc. v. RUSH/Consutec Joint Venture* is inapposite because that case involved "construction work . . . performed on [a] military base[]" (i.e., federally-owned land). (*Id.* at 18 (citing *United States ex rel. DLM Dev. Grp., Inc. v. RUSH/Consutec Joint Venture*, No. 5-22457, 2006 WL 8433268, at *1 (S.D. Fla. Apr. 26, 2006)); *see also id.* at 19 (citing *Airport Constr. & Materials, Inc. v. Bivens*, 649 S.W.2d 830, 832 (Ark. 1983)) (implying that ownership of the land may be salient). If anything, Timberline says, *DLM* supports its position here, because the court considered the preemption argument only in the context of the subcontractor's Miller Act claim, not its state law claims. (*Id.* at 19–20 (citing *DLM*, 2006 WL 8433268, at *2–4).) Separately, Timberline argues that *Johnson v. Maryland* "is clearly distinguishable because it involve[d] the licensing of a federal employee, which APTIM is not." (*Id.* at 20 (citing *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)).) Finally, *United States v. 9.345 Acres of Land, More or Less, Situated in Iberville Parish* "is completely irrelevant" because it is a *Daubert* case. (*Id.* (citing *United States v. 9.345 Acres of Land, More or Less, Situated in Iberville Parish*, No. 11-803, 2018 WL 11421289, at *3 (M.D. La. Mar. 29, 2018) (deGravelles, J.)).)

### B. APTIM's Opposition (Doc. 133)

APTIM urges the Court to deny Timberline's *MSJ*, in part because Timberline seeks to assert an affirmative defense that it did not raise in its original Complaint or in any of its three Amended Complaints. (Doc. 133 at 3 (citing Docs. 1, 3, 18, 63).) APTIM explains that failure to raise an affirmative defense in a responsive pleading "forfeits the defense," unless the party "raises the issue at a pragmatically sufficient time," and the other party "is not prejudiced in its ability to

respond." (*Id.* at 4 (quoting *NewCSI, Inc. v. Staffing 360 Sols., Inc.*, 865 F.3d 251, 259 (5th Cir. 2017)).) "The prejudice inquiry focuses on whether the plaintiff had sufficient notice to prepare for and contest the defense." (*Id.* (internal quotation marks omitted) (quoting *NewCSI*, 865 F.3d at 259).) APTIM avers that it "will be severely prejudiced if the Court permits the late assertion of this affirmative defense" through Timberline's *MSJ.* (*Id.*) Specifically, it suggests that, had it known of this affirmative defense sooner, it "would have sought leave to assert" tort claims against Timberline, that its expert reports "would have addressed the proper measure of damages" under such claims, that its deposition questioning "would have looked markedly different," and that third-party discovery "could have occurred." (*Id.*)

APTIM contends, however, that the Court should deny Timberline's *MSJ* even if it reaches the merits. (*Id.* at 5.) According to APTIM, federal laws commonly preempt state licensing laws. (*Id.* at 6 (citing, *inter alia*, *Sperry v. Fla. ex rel. Fla. Bar*, 373 U.S. 369 (1963)).) In *Leslie Miller*, the Supreme Court expressed general concern about frustrating federal policy by "giv[ing] [a] State's licensing board a virtual power of review over the federal determination of 'responsibility.'" (*Id.* at 7 (emphasis omitted) (quoting *Leslie Miller*, 352 U.S. at 190).) And in *Gartrell*, the Ninth Circuit read *Leslie Miller* broadly in holding that "*when* a license becomes 'required' is of no consequence to the preemption analysis." (*Id.* at 8 (citing *Gartrell*, 940 F.2d at 439).) *Gartrell* also considered the import of the Permits and Responsibilities Clause and nevertheless concluded that "state licensing laws cannot be 'applicable,' nor compliance with them 'necessary,' where [they] are preempted by federal law." (*Id.* at 9 (quoting *Gartrell*, 940 F.2d at 440).) Lastly, APTIM claims that this Court applied *Leslie Miller* and its progeny in *9.345 Acres of Land*, (*id.* at 9–10 (citing *9.345 Acres of Land*, 2018 WL 11421289, at *3–4)), and that this

District's local rules admit different licensing requirements for attorneys appearing on behalf of the federal government, (*id.* at 10 (citing M.D. La. Civ. R. 83(b))).

APTIM notes that the USACE owned the Project and that, "[a]t all relevant times, the federal government and its laws governed the Project." (*Id.* at 11 (citing, *inter alia*, Doc. 117-6 at 14).) Thus, APTIM says, application of Florida's licensing law "would upset federal legislative choices," raising the issue of conflict preemption. (*Id.*) Such preemption "extend[s] to subcontractors as well." (*Id.* at 11–12 (citing *DLM*, 2006 WL 8433268, at *3; *Bivens*, 649 S.W.2d at 831–32; *Elec. Constr. Co. v. Flickinger*, 485 P.2d 547, 548 (Ariz.), *cert. denied*, 404 U.S. 952 (1971)).) In *Electric Construction Co. v. Flickinger*, for example, the Arizona Supreme Court "expressly held" that the relevant state licensing law "ha[d] no application to subcontractors engaged in the performance of duties for the benefit of the United States." (*Id.* at 12–13 (quoting *Flickinger*, 485 P.2d at 549).) APTIM also observes that Florida's licensing law "recognizes that there are situations where 'a state license is not required.'" (*Id.* at 13 (quoting Fla. Stat. § 489.128(1)(a)); *see also id.* (citing *Poole & Kent Co. v. Gusi Erickson Constr. Co.*, 759 So. 2d 2, 6 (Fla. 2d DCA 1999)) (opining on the purpose of Florida's law).) It asserts that "[t]his is clearly one of those situations." (*Id.*)

Next, APTIM argues that the Permits and Responsibilities Clause does not contemplate state licenses given *Leslie Miller*'s holding that "a state contractor's license was not 'necessary.'" (*Id.* (referencing *Gartrell*, 940 F.2d at 440).) Indeed, Timberline has cited no authority to the contrary, nor can it point to any case which casts doubt upon *Gartrell*'s analysis of the clause. (*Id.* at 14.) Instead, Timberline has cited a lone law review article. (*Id.* (citing Doc. 117-2 at 12).) Thus, APTIM declares, "[t]here is no jurisprudential basis to reject *Gartrell*, and Timberline's attempt to distinguish the case should be disregarded by this Court." (*Id.*)

In addition, APTIM contends that *North Dakota* is inapposite because it dealt with states' "authority to regulate the importation of alcoholic beverages," which is governed by the Twenty-First Amendment. (*Id.* (citing *North Dakota*, 495 U.S. at 431); *see also id.* at 14–15 (citing, *inter alia*, *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325 (3d Cir. 2025)) ("[E]ven after *North Dakota*, state regulations on contractors are constitutionally invalid under the intergovernmental-immunity doctrine if they substantially interfere with the federal government's activities." (cleaned up)).) According to APTIM, state licensing laws such as Florida's are a category apart. (*Id.* at 15.)

Lastly, APTIM argues that the ownership of the land (i.e., private versus federal) is irrelevant, because the federal government leased the land and "clearly had an interest" in the Project, and because APTIM and Timberline were both contracted to work on the Project (i.e., for the federal government). (*Id.*; *see also id.* at 15–16 (citing, *inter alia*, *DLM*, 2006 WL 8433268, at *3).) APTIM notes that, in other contexts, courts have rejected the distinction between ownership and lease. (*Id.* at 16–17 (citing *U.S. Postal Serv. v. City of Hollywood*, 974 F. Supp. 1459, 1460 (S.D. Fla. 1997)).) In *United States Postal Service v. City of Hollywood*, for example, the court "refused to apply state building codes to [a] federal project" on privately-owned land in light of *Johnson* and *Leslie Miller*. (*Id.* (citing *Hollywood*, 974 F. Supp. at 1464).)

### C. Timberline's Reply (Doc. 138)

Timberline complains that APTIM has not undertaken preemption analysis, but rather has "hid[den] behind inapplicable and non-binding cases." (Doc. 138 at 1.) According to Timberline, the instant case is different from others because: (1) The federal government did not determine APTIM's responsibility. (*Id.* at 1–2.) (2) "There is no state actor attempting to stop or even inhibit the Project, *which was completed*[.]" (*Id.* at 2.) (3) The case involves state law claims by one private party against another. (*Id.* at 2–3.) The federal government therefore has no interest in the

dispute. (*Id.* at 3.) And (4) the Project was located on privately-owned land. (*Id.* at 2, 4.) Timberline

contends that *Leslie Miller* "applied an *entirely different law* than the one at issue before the Court"

and that *Gartrell* "failed to acknowledge" the change in law and the concomitant "shift in federal

contracting policy." (*Id.* at 2 (citing *Leslie Miller*, 352 U.S. 187; *Gartrell*, 940 F.2d at 439).)

According to Timberline, the purpose of the FAR is to attain the "best overall value." (*Id.* (citing

48 C.F.R. §§ 1.102(a), 9.104–1); *see also id.* at 2–3.)

Relatedly, Timberline denies that any of the additional cases cited by APTIM "move the

needle." (*Id.* at 3.) It asserts that *Flickinger* is inapposite because the dispute here "is between two

private parties, addressing the enforceability of a contract *after completion* of the Project on private

land." (*Id.* at 3–4.) Likewise, Timberline contests the applicability of *DLM* and *Bivens*, accusing

APTIM of "cherry[-]pick[ing] irrelevant dicta" from cases "where the work at issue was performed

on federally owned land." (*Id.* at 4 (emphasis omitted) (citing *DLM*, 2006 WL 8433268; *Bivens*,

649 S.W.2d 830).) *Hollywood*, too, is distinguishable, because it concerned a "*local government's*

attempt to enforce its [building] code, inhibiting progress of the construction project." (*Id.* (citing

*Hollywood*, 974 F. Supp. at 1463–65).)[4] By contrast, *North Dakota* remains relevant because "a

---

[4] Timberline adds that *Hollywood* "supports Timberline's position because two of APTIM's primary complaints are that Timberline's work failed to comply with Lee County requirements and that Lee County's inspector failed Timberline's work." (Doc. 138 at 4 (citing Doc. 118-2 at 11–14).) This argument can plausibly mean several different things. To the extent that Timberline means to suggest that, by the logic of *Hollywood*, APTIM should not be able to reference Lee County requirements in its *Motion for Partial Summary Judgment* (Doc. 118), Timberline should have raised this argument in its *Opposition* to that motion. Alternatively, if Timberline truly means to argue that *Hollywood* supports its position, then this lone sentence—without any citation to *Hollywood* itself—is inadequate. Still another possibility is that Timberline means to say that APTIM's references to the Lee County requirements belie its claim that federal law preempts state law here. (*See also* Doc. 114 at 2–3; Doc. 145 at 1.) But as APTIM explained in its *Sur-Reply*, the USACE expressly required conformity with "the latest revisions of the Lee County Utilities Manual." (Doc. 145 at 2 (citing Doc. 118-5 at 131 n.1).) In other words, APTIM's *Motion for Partial Summary Judgment* references "requirements incorporated by the federal government *into . . . contract documents*." (*Id.* (emphasis added).) There is no indication that the USACE similarly required that APTIM be licensed as a contractor in Florida. (*Id.* at 2–3.) Thus, the Court agrees with APTIM that "[i]t is easy to harmonize" its *Motion for Partial Summary Judgment* with its *Opposition* here. (*Id.* at 2.) Because APTIM's *Sur-Reply* is wholly devoted to this argument, the Court has not summarized it above.

reading of the case shows that" the Twenty-First Amendment "did not influence the Court's opinion." (*Id.* at 3 n.1.)

Lastly, Timberline argues that, as the counterclaimant, APTIM "bears the burden of proving the existence of a 'valid, enforceable contract.'" (*Id.* at 5 (quoting *Fayad v. Univ. of Miami*, 395 So. 3d 203, 205 (Fla. 3d DCA 2024)).) Thus, Timberline says, it can bring this motion regardless of the Court's decision whether to grant leave to amend the Complaint to assert an additional affirmative defense. (*See id.*) Alternatively, the Court can raise the issue of the Timberline Subcontract's enforceability *sua sponte*. (*Id.* (citing *Rotemi Realty, Inc. v. Act Realty Co.*, 911 So. 2d 1181, 1185 n.1 (Fla. 2005)).) Even if unenforceability *is* an affirmative defense, Timberline avers that it has not waived the argument. (*Id.* at 5–6 (citing, *inter alia*, *Walton v. City of Verona*, 82 F.4th 314, 324 (5th Cir. 2023)).)

## IV. DISCUSSION

### A. Whether Timberline Can Now Raise Unenforceability

#### 1. *Applicable Law*

"In responding to a pleading, a party must affirmatively state any . . . affirmative defense . . . ." Fed. R. Civ. P. 8(c)(1); *see also Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (citations omitted) ("Ordinarily, it is incumbent on the defendant to plead and [to] prove such a defense."). "In a diversity case, substantive state law determines" what qualifies. *LSREF2, Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014); *see also* 5 *Wright & Miller's Federal Practice & Procedure* § 1271 (4th ed. 2025). "Failure to *timely* plead an affirmative defense may result in waiver and the exclusion of the defense from the case." *LSREF2*, 751 F.3d at 398 (emphasis added) (citing *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 342–43 (5th Cir. 1988)).

Despite the above requirements, "there is 'play in the joints.'" *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 439 (5th Cir. 2023) (quoting *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008)). That is, "technical failure to comply precisely with Rule 8(c) is not fatal." *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983) (per curiam) (citing *Jones v. Miles*, 656 F.2d 103, 107 n.7 (5th Cir. 1981)). If the defendant raises the affirmative defense "at a pragmatically sufficient time," and the plaintiff "is not prejudiced in its ability to respond," then the court need not find waiver. *Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan*, 920 F.3d 269, 274 (5th Cir. 2019) (quoting *NewCSI*, 865 F.3d at 259); *accord Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 610 (5th Cir. 2007) (citing *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986)); 5 *Wright & Miller's Federal Practice & Procedure* § 1278 (4th ed. 2025) ("[T]he substance of many unpleaded Rule 8(c) affirmative defenses may be asserted by pretrial motions, particularly in the absence of any showing of prejudice to the opposing party and assuming it has had an opportunity to respond."). Such flexibility "is consistent with the Supreme Court's interpretation of the purpose of Rule 8(c), which is to give the opposing party notice of the affirmative defense and a chance to argue why it should not apply." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577–78 (5th Cir. 2009) (citing *Blonder-Tongue Laboratories, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)); *see also Morris*, 853 F.2d at 342 ("The purpose of Rule 8(c) . . . is to inform the court and the parties how the case will be tried.").

Whether to allow a party to raise an affirmative defense despite non-compliance with Rule 8(c) is within the district court's discretion. *See Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013). This decision entails a "fact-specific inquiry based on the circumstances of the case." *LSREF2*, 751 F.3d at 402 (citations

omitted). The court's "central concerns" are "[u]nfair surprise and prejudice" to the other party. *Id.* (citing *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987)). Notably, courts have "repeatedly rejected waiver arguments" when a party has raised an affirmative defense "for the first time at summary judgment—or even later." *Walton*, 82 F.4th at 324 (citing *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 772 (5th Cir. 2017)); *see, e.g.*, *Pasco*, 566 F.3d at 578 (allowing defendant to raise affirmative defense of qualified immunity at summary judgment); *Lafreniere Park Found. v. Broussard*, 221 F.3d 804, 808 (5th Cir. 2000) (allowing defendants to raise affirmative defense at summary judgment, in part because plaintiff had multiple opportunities to brief the issue); *Allied Chem.*, 695 F.2d at 855–56 ("There was no surprise here. Although not pled, the [affirmative] defense was included in the . . . pretrial order."); *Grant v. Preferred Rsch., Inc.*, 885 F.2d 795, 797–98 (11th Cir. 1989) ("[I]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, 'the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.'" (quoting *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988))).

### 2. Analysis

Preliminarily, the Court considers whether Timberline can argue for the first time at summary judgment that APTIM was unlicensed and therefore cannot enforce the Timberline Subcontract. The Court need not scrutinize whether Timberline's argument is, in fact, an affirmative defense.[5] (*Compare* Doc. 133 at 3–4, *with* Doc. 138 at 5–7.) Even assuming that it is,

---

[5] *But see Marinich v. Special Edition Custom Homes, LLC*, 1 So. 3d 1197, 1198 (Fla. 2d DCA 2009) (noting that the plaintiffs raised Florida Statutes § 489.128 as an affirmative defense to the counterclaim); *SG 2901, LLC v. Complimenti, Inc.*, 323 So. 3d 804, 805 (Fla. 3d DCA 2021) ("SG asserted as an affirmative defense that Complimenti was not a licensed contractor and [was] therefore barred by statute from enforcing the parties' contract."); *Incident365 Fla., LLC v. Ocean Pointe V Condo. Ass'n, Inc.*, 404 So. 3d 475, 476–77 (Fla. 3d DCA 2024) ("[The defendants] raised numerous affirmative defenses, including unlicensed contracting under [Florida Statutes § 489.128].); *Earth Trades, Inc. v. T & G Corp.*, 42 So. 3d 929, 930 (Fla. 5th DCA 2010) ("[The defendant] contends that the trial court erred in granting a partial summary judgment, precluding [the defendant] from raising as an affirmative defense that

waiver would be too extreme a penalty given the circumstances. *See Arismendez*, 493 F.3d at 611 ("We need not determine whether the relevant statutory caps constitute affirmative defenses under Texas law. Assuming *arguendo* that the statutory caps are affirmative defenses, [the plaintiff] has not shown that [the defendant] waived the defense.").

Timberline raised this argument in its *Motion for Leave to File Amended Answer and Affirmative Defenses to Counterclaim* (Doc. 106), filed more than nine months before trial. (*See* Doc. 105 at 2 (scheduling trial for March 2, 2026).) The argument also forms the exclusive basis for the instant *MSJ* (Doc. 117), filed more than six months before trial. (*See* Doc. 105 at 2.) APTIM has been given—and has taken—the opportunity to oppose both motions. (*See* Docs. 109, 133); *see also Walton*, 82 F.4th at 324 ("[T]here is no evidence that [the plaintiffs] were prejudiced. [They] had the opportunity to respond to the issue, and the district court even found that their [tort] claims should survive summary judgment. Waiver did not occur here." (internal citation omitted)). Thus, Timberline has raised the argument "at a pragmatically sufficient time," and APTIM has not been "prejudiced in its ability to respond." *See Germain*, 920 F.3d at 274. Timberline's purported "technical failure to comply precisely with Rule 8(c) is not fatal." *See Allied Chem.*, 695 F.2d at 855–56 (citing *Jones*, 656 F.2d at 107 n.7).

### B. Whether Florida's Licensing Requirement Applies

#### 1. Applicable Law

##### a. Florida's Licensing Law

"[I]n the interest of the public health, safety, and welfare," the Florida Legislature has enacted laws "regulat[ing] the construction industry." Fla. Stat. § 489.101. Under the current

---

the contract was unenforceable . . . ."); *Ramindesign, LLC v. Skarzynski*, No. 23-24838, 2024 WL 3312053, at *4 (S.D. Fla. May 20, 2024) ("[Defendant] Jacek does not dispute that Plaintiff has established the elements of a breach of contract claim. Jacek instead moves for dismissal on an affirmative defense . . . that Plaintiff is an unlicensed contractor barred from enforcing the agreement under Florida Statute[s] § 489.128(1).").

statutory scheme, a "contractor" is "the person who is qualified for, and is only responsible for, the project contracted," and "who, for compensation, undertakes to, submits a bid to, or does himself or herself or by others construct, repair, alter, remodel, add to, demolish, subtract from, or improve any building or structure . . . for others or for resale to others." *Id.* § 489.105(3). Additionally, in order to qualify as a "contractor," the scope of a person's job must be "substantially similar to the job scope described in one of the paragraphs of [Florida Statutes § 489.105]." *Id.*; *see also Full Circle Dairy, LLC v. McKinney*, 467 F. Supp. 2d 1343, 1345–46 (M.D. Fla. 2006) (describing a similar two-pronged test for determining whether a person is a "contractor"). Any person who meets the definition of "contractor" must be "certified or registered in order to engage in the business of contracting in [Florida]." Fla. Stat. § 489.113(2); *see also Deep S. Sys., Inc. v. Heath*, 843 So. 2d 378, 379 n.1 (Fla. 2d DCA 2003) (citing Fla. Stat. §§ 489.111, 489.113, 489.117) (distinguishing between "certification licensure" and "registration licensure"). A business entity is unlicensed if it "does not have a primary or secondary qualifying agent in accordance with this part concerning the scope of the work to be performed under the contract." Fla. Stat. § 489.128(1)(a).

"As a matter of public policy, contracts entered into on or after October 1, 1990, by an unlicensed contractor shall be unenforceable in law or in equity by the unlicensed contractor." *Id.* § 489.128(1). In other words, the unlicensed contractor "has no rights or remedies for the enforcement of the contract." *Earth Trades*, 108 So. 3d at 586. Likewise, it "cannot assert contractual defenses." *Southpoint*, 415 So. 3d at 747 (citing *John Hancock-Gannon Joint Venture II v. McNully*, 800 So. 2d 294, 297 (Fla. 3d DCA 2001)). *But see Brock v. Garner Window & Door Sales, Inc.*, 187 So. 3d 294, 296 (Fla. 5th DCA 2016) (explaining that neither Florida Statutes § 489.128 nor *Earth Trades* "precludes . . . asserting *statutory* defenses" (emphasis added)). These

18

"draconian effects of the statute" are intended "to prod contractors into obtaining the required licensing." *Earth Trades*, 108 So. 3d at 586.

There are, however, a number of exceptions to Florida's licensing requirement. *See* Fla. Stat. § 489.103. Most relevantly, the requirement "does not apply to: . . . [a]ny construction, alteration, improvement, or repair carried on within the limits of any site the title to which is in the United States *or with respect to which federal law supersedes this part*." *Id.* § 489.103(8) (emphasis added).

### b.  Preemption of State Licensing Laws

The Supremacy Clause provides that the U.S. Constitution "and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Accordingly, "'the law of the State, though enacted in the exercise of powers not controverted, must yield' when incompatible with federal legislation." *Sperry*, 373 U.S. at 384 (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23 (1824)). "Federal law preempts not only state laws that expressly prohibit the very act [which] the federal law allows, but those that 'stand as an obstacle to the accomplishment of the full purposes and objectives' of federal law." *Surrick v. Killion*, 449 F.3d 520, 532 (3d Cir. 2006) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)); *accord Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015). In other words, for purposes of preemption, it may be "sufficient that the state law 'impose[s] . . . additional conditions' not contemplated by Congress." *Surrick*, 449 F.3d at 532 (quoting *Sperry*, 373 U.S. at 385); *accord Hollywood*, 974 F. Supp. at 1465 (citing *Perez v. Campbell*, 402 U.S. 637 (1971); *Hines v. Davidowitz*, 312 U.S. 52 (1941)) ("Examination of the [state] regulation is limited to determining whether the impact on the [federal] government's activity is incidental or intrusive."). Federal regulations have preemptive force. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458

U.S. 141, 153–54 (1982); *accord Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1265–66 (11th Cir. 2004) (citing *Fidelity*, 458 U.S. at 153–54).

In *Leslie Miller*, the Supreme Court held that Arkansas's licensing law did not apply to a contractor performing work on behalf of the federal government. *Leslie Miller*, 352 U.S. at 188, 190. There, the Armed Services Procurement Regulations established certain criteria for determining a contractor's responsibility. *Id.* at 189. Arkansas's licensing law set forth "similar factors . . . to guide the [state's] Contractors Licensing Board" in making its own determinations about which contractors were worthy of licensure. *Id.* According to the Court, this overlap was "sufficient to indicate conflict" between the federal regulations and Arkansas's law. *Id.* at 189–90. The Court cautioned: "Subjecting a federal contractor to the Arkansas contractor license requirements *would give the State's licensing board a virtual power of review* over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder." *Id.* at 190 (emphasis added); *see also id.* (quoting at length *Johnson*, 254 U.S. at 57); *see also Johnson*, 254 U.S. at 57 ("Such a requirement . . . lays hold of [Government servants] in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient.").

Subsequently, in *Gartrell*, a general contractor did not obtain a California license because it "believed that, as a contractor performing work exclusively for the federal government, it was exempt." *Gartrell*, 940 F.2d at 438. Observing that "[t]he factors [which] California considers before granting a California contractor's license are similar to those [which] the federal government considers in determining responsibility," the Ninth Circuit expressed concern that "California, through its licensing requirements, [wa]s effectively attempting to review the federal government's responsibility determination." *Id.* at 439. Crucially, *Gartrell* rejected California's

argument that *Leslie Miller* was distinct because the state licensing law at issue there "plac[ed] a condition precedent on [contractors'] right to bid [on federal contracts], whereas the California statute" applied post-award. *Id.* The Ninth Circuit explained:

> We do not read *Leslie Miller* so narrowly. The concern in *Leslie Miller* was that a state was asserting a right or power of review over the federal government's determination of "responsibility." The [Supreme] Court did not focus on the distinction between bidding and performance but on the state's interference with the federal government's responsibility determination. That interference occurs when, as here, the state requires a contractor with the federal government to comply with its licensing laws even if that requirement is not enforced until after performance has begun.

*Id.* at 440; *see also Leslie Miller*, 352 U.S. at 188 (noting that the contractor had already commenced work on behalf of the federal government when Arkansas sought to enforce its licensing requirement).

As *Gartrell* demonstrates, *Leslie Miller*'s logic sweeps broadly: "A State may not enforce licensing requirements which, though valid in the absence of federal regulation, give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress." *Sperry*, 373 U.S. at 385 (quoting *Leslie Miller*, 352 U.S. at 190). Consequently, courts "have consistently held that any state law that impedes the federal government's ability to contract—including state licensing regimes that effectively second guess United States' contracting decisions—are preempted." *Student Loan Servicing All. v. Dist. of Columbia*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018) (citing *United States v. Virginia*, 139 F.3d 984, 987–89 (4th Cir. 1998); *Gartrell*, 940 F.2d at 439–41).[6]

---

[6] *See also Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543–44 (1958) ("Here, . . . the State places a prohibition on the Federal Government. . . . [T]he conflict between the federal policy of negotiated rates and

Courts have also held—explicitly and implicitly—that *Leslie Miller*'s logic extends to subcontractors. *See, e.g.*, *Flickinger*, 485 P.2d at 548 ("[W]here the federal government does not make a direct [responsibility] determination, can the principle of [*Leslie Miller*] extend to a subcontractor to relieve [it] from complying with the state [licensing] law? We think so."). In *Flickinger*, for example, the Arizona Supreme Court considered the relevant federal regulation, 32 C.F.R. § 1.906(b) (1970),[7] explaining that it "recognize[d] that subcontractors are first the responsibility of the prime contractor, but in the end are but another arm of and, hence, the

---

the state policy of regulation of negotiated rates seems to us to be clear."); *Gartrell*, 940 F.2d at 438 (citing *Leslie Miller*, 352 U.S. 187) ("The [*Leslie Miller*] Court held that a state licensing requirement is invalid as applied against a contractor with the federal government because it results in interference with federal government functions and is in conflict with federal procurement legislation . . . ."); *Virginia*, 139 F.3d at 988 ("[T]he [*Leslie Miller*] Court held that the federal and state regulatory schemes 'conflict[ed]' because the state could, in effect, declare 'irresponsible' a contractor whom the federal government had declared 'responsible.'" (quoting *Leslie Miller*, 352 U.S. at 190)); *Penn. Higher Educ. Assistance Agency v. Perez*, 457 F. Supp. 3d 112, 123–25 (D. Conn. 2020) (citing, *inter alia*, *Leslie Miller*, 352 U.S. at 190; *Sperry*, 373 U.S. at 385) ("Connecticut's licensing scheme for student loan servicers . . . overlaps with—and potentially interferes with—Education's selection process for its own contractors."); *DLM*, 2006 WL 8433268, at *3 (following *Bivens* and explaining that the case "is but one of several cases that have followed *Leslie Miller*, and found state licensing laws preempted by applicable federal law where the contractor is doing construction work for the United States"); *Peter Kiewit Sons' Co. v. State Bd. of Equalization*, 505 P.2d 102, 109–10 (Mont. 1973) (citing *Leslie Miller*, 352 U.S. 187) (holding, consistent with a broad reading of *Leslie Miller*, that "the provisions of the [Montana] Act which pertain to qualifications or competence of public contractors [are] not applicable to federal contractors"); *Flickinger*, 485 P.2d at 549 ("We hold [that] Arizona's contractor's licensing act has no application to subcontractors engaged in the performance of duties for the benefit of the United States."); *Metro Tristate, Inc. v. Pub. Serv. Comm'n of W. Va.*, 859 S.E.2d 438, 450 (W. Va. 2021) ("The conflict preemption principle guiding our decision is . . . that when a federal agency determines that a contractor meets some federal contract or procurement qualification set by Congress, a state agency may not exercise its authority and impose additional state-law qualifications that stand as an obstacle to that federal agency determination and, more specifically, to the qualifications set by Congress."); *cf. Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 762 (9th Cir. 2025) (citing, *inter alia*, *Leslie Miller*, 352 U.S. at 188; *Gartrell*, 940 F.2d at 438–39) ("Those impermissible licensing and permitting regimes involved direct control by the state over federal government operations.").

[7] Notably, 32 C.F.R. § 1.906(b) (1970) is similar to 48 C.F.R. § 9.104–4, which Timberline has cited as relevant here. (*See* Doc. 117-2 at 12–13.) The former reads:

> Notwithstanding the general responsibility of a prospective contractor to demonstrate the responsibility of his prospective subcontractors, *it may be in the Government's best interest to make a direct determination of the responsibility of one or more prospective subcontractors prior to award of the prime contract. . . . The determination of responsibility of a proposed subcontractor by the Government shall be based on the same factors as are applicable in a determination of responsibility of a prospective prime contractor.*

32 C.F.R. § 1.906(b) (1970) (emphasis added). Likewise, 48 C.F.R. § 9.104–4 provides:

> Determinations of prospective subcontractor responsibility may affect the Government's determination of the prospective prime contractor's responsibility. A prospective contractor may be required to provide written evidence of a proposed subcontractor's responsibility. . . . *When it is in the Government's interest to do so, the contracting officer may directly determine a prospective subcontractor's responsibility . . . . In this case, the same standards used to determine a prime contractor's responsibility shall be used by the Government to determine subcontractor responsibility.*

48 C.F.R. § 9.104–4 (emphasis added).

responsibility of the federal government." *Flickinger*, 485 P.2d at 549; *see also id.* ("The burden which may be imposed could in some instances frustrate the express federal policy. It is not the fact that there may not be a conflict concerning subcontractors' responsibility; it is the fact that there may be."); *cf. Urbatec v. Yuma Cnty.*, 614 F.2d 1216, 1219 n.4 (9th Cir. 1980) ("Unlike the contractor in *Flickinger*, Urbatec is not a subcontractor of the federal government, but a contractor of the State of Arizona. Applying the state licensing statute in this case could not frustrate any federal interest . . . ."). Likewise, in *Bivens*, the Arkansas Supreme Court held that the state licensing law did not apply to the plaintiff-subcontractor, explaining: "Amplification of [*Leslie Miller*'s] policy makes it clear that were even the subcontractor subject to state regulations, the federal policy would be frustrated." *Bivens*, 649 S.W.2d at 831–32; *see also Gartrell*, 940 F.2d at 440 n.3 (citing *Flickinger*, 485 P.2d 547, and *Bivens*, 649 S.W.2d 830, with approval).

Although the above cases are not binding here, the Court subscribes to their logic. Under the relevant FAR provision, the federal government generally tasks the prime contractor with determining the responsibility of subcontractors, but it also retains the power to make such determinations itself. *See* 48 C.F.R. § 9.104–4. Further, a prime contractor's determination of a subcontractor's responsibility may, in turn, influence the federal government's determination of the prime contractor's responsibility. *Id.* Ultimately, then, the selection of subcontractors is the prerogative of the federal government. And functionally, subcontractors are "another arm of . . . the federal government." *See Flickinger*, 485 P.2d at 549. Plus, if subcontractors are performing work *on a federal project*, then it follows that *Leslie Miller*'s holding extends to them. *See Bivens*, 649 S.W.2d at 831–32. Otherwise, the state would remain empowered to frustrate federal interest(s) by enforcing its licensing law against subcontractors. *Cf. Urbatec*, 614 F.2d at 1219 n.4; *see also Technica LLC ex rel. U.S. v. Carolina Cas. Ins. Co.*, 749 F.3d 1149, 1154 (9th Cir. 2014)

(explaining, albeit in the context of a Miller Act claim, that "[f]ederal subcontractors routinely bid on projects throughout the country and often perform contracts that span multiple states").

## 2. *Analysis*

This brings the Court to the ultimate issue: whether APTIM was subject to Florida's licensing requirement. At the outset, the Court notes the context in which the dispute between Timberline and APTIM arose. Following Hurricane Ian—and pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5121 *et seq.*—FEMA leased land from a private owner, Habitat, in order to build temporary housing for displaced individuals. (*See* Doc. 117-1 at 1, ¶¶ 1–2; Doc. 133 at 11.) At all relevant times, the USACE was responsible for the Project. (*See, e.g.*, Doc. 117-6 at 14.) The USACE hired BAJV as general contractor. (Doc. 117-1 at 1, ¶ 1.) BAJV hired APTIM, which hired Timberline. (*Id.* at 2, ¶¶ 4, 7.) APTIM and Timberline were, in other words, subcontractors working on a federal project. The Timberline Subcontract provided for Timberline's work on the Project. (*See* Doc. 117-8.)

FAR Sections 1.101 and 1.102 state the purpose of the Federal Acquisition Regulations System: "The Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies." 48 C.F.R. § 1.101. "The vision for the Federal Acquisition System is to deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives." *Id.* § 1.102(a). With these interests in mind, the federal government determines the responsibility of prospective contractors and, in some cases, subcontractors.[8] *See id.* §§ 9.104–1, 9.104–4.

---

[8] 48 C.F.R. § 9.104–1 provides: "To be determined responsible, a prospective contractor must—
 (a)  Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104–3(a));

Given the origin and nature of the Project, the purpose of the Federal Acquisition Regulations System, and the persuasive logic of *Leslie Miller* and its progeny, the Court now concludes that APTIM was not, in the context of this federal Project, (*see, e.g.*, Doc. 117-6 at 14), subject to Florida's licensing law. The Court notes as well that Florida's scheme appears to contemplate precisely this result: Florida Statutes § 489.103(8) exempts "[a]ny construction, alteration, improvement, or repair carried on within the limits of any site the title to which is in the United States *or with respect to which federal law supersedes this part*." Fla. Stat. § 489.103(8) (emphasis added). In making this determination, the Court has carefully considered Timberline's many arguments against preemption. The Court discusses each in turn below.

First, Timberline contends that federal policy has shifted since *Leslie Miller*. (Doc. 117-2 at 15 n.3.) That is, price is no longer the "paramount consideration in federal procurement." (*Id.*) "Rather, agencies are instructed to evaluate both cost and non-cost factors . . . and to make trade-offs that yield the best overall value." (*Id.* (emphasis omitted).) Worth noting, this argument misstates federal policy at the time when *Leslie Miller* was decided. *See Leslie Miller*, 352 U.S. at 188–90; *see also Virginia*, 139 F.3d at 989 n.6 (explaining that the "responsibility" determination is not simply a matter of "select[ing] the most 'competitive' bid"). The policy then was to select the "lowest *responsible* bidder," which entailed consideration of a number of non-cost factors,

---

(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c) Have a satisfactory performance record (see 9.104–3(b) and subpart 42.15). A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in 9.104–2;

(d) Have a satisfactory record of integrity and business ethics (for example, see subpart 42.15);

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104–3(a));

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104–3(a)); and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations (see also inverted domestic corporation prohibition at 9.108)."

enumerated in *Leslie Miller* itself. *Leslie Miller*, 352 U.S. at 188–90 (emphasis added). Indeed, most of the factors contained in 48 C.F.R. § 9.104–1—which Timberline cites in support of its assertion that federal policy has changed, (*see* Doc. 117-2 at 15 n.3)—are essentially the same as the "responsibility" factors recited by the *Leslie Miller* Court, *see Leslie Miller*, 352 U.S. at 189.

But even if Timberline were correct that federal interests shifted post-*Leslie Miller*, such that they are now more closely aligned with the interests advanced by Florida's licensing law, the Court would still find that the FAR preempts Florida's licensing law here. Seemingly, Timberline has conflated "contradiction" with "conflict," arguing that, because Florida's licensing law does not contradict the FAR, there is no conflict. (*See* Doc. 117-2 at 2 ("[B]oth [the federal regulations and Florida's licensing law] share the goal of ensuring [that] contractors are capable and qualified to perform the relevant scope of work."); *see also id.* at 11–13 (arguing that Florida's licensing law advances federal interests, such that it is "in harmony" with the relevant federal regulations).) But harmonization of Florida's law with the FAR plainly raises the issue of an implied conflict. In *Leslie Miller*, the source of the Court's concern was that Arkansas's law required the state's Contractors Licensing Board to consider factors similar to the federal "responsibility" criteria. *See Leslie Miller*, 352 U.S. at 189–90. The Court explicitly warned: "Mere enumeration of the similar grounds for licensing under the state statute and for finding 'responsibility' under the federal statute and regulations is sufficient to indicate conflict . . . ." *Id.* If anything, then, Timberline's "harmony" argument weakens its position.

Second, Timberline argues that the inclusion of the Permits and Responsibilities Clause in the BAJV-APTIM subcontract required APTIM to comply with Florida's licensing law.[9] (Doc.

---

[9] At one point in its brief, Timberline also points to 48 C.F.R. § 9.104–1(g) for its requirement that a prospective contractor "[b]e otherwise qualified and eligible to receive an award under applicable laws and regulations." (Doc. 117-2 at 12 (quoting 48 C.F.R. § 9.104–1(g)).) The Court understands Timberline to be making a similar argument to

117-2 at 11, 16.) Notably, in *Gartrell*, the Ninth Circuit considered and rejected essentially the same argument. *See Gartrell*, 940 F.2d at 440. The court observed that a more or less identical clause existed when the Supreme Court decided *Leslie Miller*. *Id.*; *see* 32 C.F.R. § 596.531–1 (1951). It therefore determined that, pursuant to the clause, federal contractors are "required to obtain any *necessary* licenses and [to] comply with any *applicable* state laws, codes and regulations." *Id.* (emphasis in original). But "[f]ollowing *Leslie Miller*, state licensing laws *cannot* be 'applicable', nor compliance with them 'necessary', where such laws are preempted by federal law." *Id.* (emphasis added).

Timberline asserts that *Gartrell* was "severely flawed" in that it read too much into *Leslie Miller* and rendered the Permits and Responsibilities Clause superfluous. (Doc. 117-2 at 16 (citing *Gartrell*, 940 F.2d at 439–40).) As the Court has noted above, *Gartrell* is not alone in its broad reading of *Leslie Miller*. In fact, Timberline has not identified a single case which contradicts *Gartrell* or which proposes a narrower interpretation of *Leslie Miller*. (*See* Docs. 117-2, 138.) In addition, the Court disagrees with Timberline that *Gartrell* renders the Permits and Responsibilities Clause superfluous. (*See* Doc. 117-2 at 11, 16 (citing *Gartrell*, 940 F.2d at 439–40).) The clause does not single out licensing laws like Florida's. *See* 48 C.F.R. § 52.236–7. Nor does it require contractors "to comply with *all* state laws."[10] (*See* Doc. 117-2 at 2 (emphasis

---

the above (i.e., that state licensing is textually required). But seemingly, Timberline has taken FAR Section 9.104–1(g) out of context. This requirement cross-references FAR Section 9.108, which, with few exceptions, prohibits "contracts with either an inverted domestic corporation, or a subsidiary of such a corporation." 48 C.F.R. § 9.108–2(a). Timberline gives the Court no reason to conclude that FAR Section 9.104–1(g) contemplates state licensing laws like Florida's. Indeed, if this sub-section *did* require compliance with such laws, then *Leslie Miller* and its progeny would necessarily be wrongly decided. *See, e.g.*, *Leslie Miller*, 352 U.S. at 188–89 (reciting the requirements for a determination of responsibility under the Armed Services Procurement Regulations, including that a contractor "[be] otherwise qualified and eligible to receive an award under applicable laws and regulations").

[10] The Court also notes that it is questionable whether the Permits and Responsibilities Clause *mandates* compliance with all applicable "Federal, State, and municipal laws, codes, and regulations." *See* 48 C.F.R. § 52.236–7. In *Geren v. Tecom, Inc.*, the Federal Circuit explained that the clause provides only that contractors are "'*responsible* for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work' *so that [their] failure to perform is not excused if impeded*

added).) Rather, it accounts for "*any necessary* licenses and permits" and "*any* Federal, State, and municipal laws, codes, and regulations *applicable* to the performance of the work." *See* 48 C.F.R. § 52.236–7 (emphasis added); *see also Gartrell*, 940 F.2d at 439–40 (reaching the same conclusion). This language is more specific than Timberline's argument suggests or allows.

Timberline contends that, given its reading of the Permits and Responsibilities Clause, "[a] better interpretation" of *Leslie Miller* "is that the [federal] agency's pre-award responsibility determination and the contractor's post-award responsibilities under state law are separate matters." (Doc. 117-2 at 16–17 (quoting Rubenstein, *State Regulation of Federal Contractors*, *supra*, at 248).) The Court does not see how, as a practical matter, this line-drawing can be squared with *Leslie Miller*'s concern that "[s]ubjecting a federal contractor to [a state's] license requirements would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy." *Leslie Miller*, 352 U.S. at 190.

Assume temporarily that Timberline is correct: The USACE was not required to consider Florida's licensing law when awarding the Prime Contract to BAJV. But post-award, BAJV and all subcontractors were required to obtain Florida licenses in order to operate as contractors in the state. In this scenario, Florida would still have virtual review over the USACE's determination, because it would still be able to enforce its licensing law. Indeed, Florida's power of review would be *more disruptive* here, because the USACE would already have awarded the contract and would be awaiting performance of urgent work (on an abbreviated schedule, no less). In so many words, the Ninth Circuit reached the same conclusion in *Gartrell*:

---

*by [their] failure to comply with legal obligations*." *Geren v. Tecom, Inc.*, 566 F.3d 1037, 1045 (Fed. Cir. 2009) (second emphasis added) (quoting 48 C.F.R. § 52.236–7); *see also id.* ("The Permits and Responsibilities Clause does not broadly make failure to comply with the law a violation of the contract.").

> The [*Leslie Miller*] Court did not focus on the distinction between bidding and performance but on the state's interference with the federal government's responsibility determination. That interference occurs when, as here, the state requires a contractor with the federal government to comply with its licensing laws even if that requirement is not enforced until after performance has begun.

*Gartrell*, 940 F.2d at 440; *see also Student Loan Servicing All.*, 351 F. Supp. 3d at 63 ("Here, there is a risk that the federal government will contract with a servicer after evaluating its qualifications under federal law and regulations, and that servicer will nevertheless be determined unqualified by the Commissioner [of the D.C. Department of Insurance] and barred from operating in the District of Columbia . . . .").

The Court also disagrees that *North Dakota* endorses Timberline's interpretation.[11] (*See* Doc. 117-2 at 17 (citing *North Dakota*, 495 U.S. at 427–29, 439–44); Doc. 138 at 3 n.1.) In a case similar to this one—*United States v. Virginia*—the Fourth Circuit considered, at length, the significance of *North Dakota*, ultimately making two observations: (1) In *North Dakota*, "both the plurality and the dissenters cited *Leslie Miller* approvingly and reaffirmed its holding." *Virginia*, 139 F.3d at 989 n.7 (citing *North Dakota*, 495 U.S. at 435 n.7, 440, 451–53). And (2) "[w]hile the North Dakota regulations may have effectively altered the attractiveness of the bids placed by different suppliers through forced price increases, the regulations did not attempt to alter the criteria under which the federal government made its decision." *Id.* "Nor did those regulations

---

[11] Timberline insists that the Twenty-First Amendment did not influence the plurality's decision in *North Dakota*. (*See* Doc. 138 at 3 n.1.) This is simply incorrect. *See North Dakota*, 495 U.S. at 432 ("The two North Dakota regulations fall within the core of the State's power under the Twenty-first Amendment. . . . Given the special protection afforded to state liquor control policies by the Twenty-first Amendment, they are supported by a strong presumption of validity and should not be set aside lightly."); *see also id.* at 439–40 ("[W]hen the Court is asked to set aside a regulation at the core of the State's powers under the Twenty-first Amendment, as when it is asked to recognize an implied exemption from state taxation, it must proceed with particular care. Congress has not here spoken with sufficient clarity to pre-empt North Dakota's attempt to protect its liquor distribution system." (internal citations omitted)); *Lebamoff Ents., Inc. v. Huskey*, 666 F.3d 455, 458 (7th Cir. 2012) ("[W]hereas ordinarily a federal law preempts a conflicting state law, if the state law regulates alcoholic beverages the court must balance the federal and state interests; for just as the federal interests derive constitutional protection from the supremacy clause, the state interests derive constitutional protection from the Twenty-First Amendment, unlike the usual case in which federal preemption is asserted. And if the state interests are within the *core* powers that the Twenty-First Amendment confers on the states, there is a thumb on the scale—that is the 'strong presumption' or validity.").

prevent the federal government from selecting the bid it believed was most competitive or otherwise enable the state to second-guess the federal government's judgment . . . ." *Id.* Unlike North Dakota's regulations, application of Florida's licensing law would plainly, necessarily vest the state with the power to review the federal government's decision.

Third, Timberline seeks to distinguish—for one reason or another—*all* relevant cases. (*See* Doc. 117-2 at 18–20; Doc. 138 at 1–4.) By and large, the Court is not persuaded by this effort. It makes two general observations: (1) For the most part, Timberline does not explain *why* the distinctions which it draws are important. (*See* Docs. 117-2, 138.) And (2) Timberline does not cite a single case in support of drawing any distinction(s). (*See* Docs. 117-2, 138.)

As explained above, *Leslie Miller*'s logic extends to subcontractors, *see, e.g.*, *Flickinger*, 485 P.2d at 549; *Bivens*, 649 S.W.2d at 831–32, so it is irrelevant that "[t]he federal government made no responsibility determination regarding APTIM," (*see* Doc. 138 at 2); *see also Flickinger*, 485 P.2d at 549 ("The burden which may be imposed could in some instances frustrate the express federal policy. It is not the fact that there may not be a conflict concerning subcontractors' responsibility; it is the fact that there may be."). Likewise, the Court does not see the salience of the fact that the dispute here is between private parties. *See, e.g.*, *Bivens*, 649 S.W.2d at 831 (rejecting the argument that "while [*Leslie Miller*] involved a contractor in a direct relationship with the federal government, the contract [at issue in *Bivens*] [wa]s a private matter"); *DLM*, 2006 WL 8433268, at *3 (following *Bivens* by applying *Leslie Miller*'s holding to a sub-subcontractor's federal claims against a subcontractor and a contractor); *see also id.* (citing *Hollywood*, 974 F. Supp. at 1462–65; *Gartrell*, 940 F.2d at 439–41; *Flickinger*, 485 P.2d at 548–49).

Timberline also does not adequately explain the relevance of its observation that, here, FEMA leased the land on which the Project took place. (*See* Doc. 117-2 at 9, 18–19; Doc. 138 at

2, 4.) In *Hollywood*, the defendant-city explicitly argued that the United States Postal Service's contractor needed a building permit to perform work on the postal facility because the Postal Service leased, as opposed to owned, the facility. *Hollywood*, 974 F. Supp. at 1460. Citing *Johnson* and *Leslie Miller*, the district court observed that "[t]he [c]ity's [permitting] process directly intrude[d] upon the Postal Service's ability to construct the postal project at issue." *Id.* at 1462–63 (citing *Johnson*, 254 U.S. at 57; *Leslie Miller*, 352 U.S. 187). The court acknowledged that the city's "public safety concern . . . [wa]s, of course, substantial." *Id.* at 1463. But "there [wa]s no showing that the federal government [wa]s not equally committed to public safety." *Id.* The court also rejected the argument that there was a meaningful difference between federal ownership and lease. *See id.* ("Acceptance of the [c]ity's position would mean that in the case of leased facilities, the Postal Service's ability to obtain uniformity and efficiency in construction would be impeded."). Its explanation addresses some of the distinctions which Timberline now draws:

> [T]he City argues [that] it is merely requiring a private contractor that is doing work on privately owned property to obtain a building permit and abide by the building code. The City contends that the legal incidence of its regulation falls upon the contractor, not the Federal Government or its instrumentalities, and thus enforcement of the requirements is not prohibited by the supremacy clause. However, this argument is not tenable in light of *Johnson v. State of Maryland* . . . (postal employee) or [*Leslie*] *Miller v. Arkansas* . . . (contractor) where in both cases the entity actually subject to a local regulation was not the government itself but its employee or contractor.

*Id.* at 1464 (citing *Gartrell*, 940 F.2d at 437); *see also Gartrell*, 940 F.2d at 438 (focusing on whether the *project* was federal); *DLM*, 2006 WL 8433268, at *3 (same).

Finally, Timberline posits that, because APTIM brings only *state law* claims *after completion of all work*, federal law does not, under the circumstances, preempt Florida's licensing

law.[12] Once again, the Court disagrees. The nature and timing of the claims seem, to the Court, irrelevant here. If the Court were to agree with Timberline on these bases, it would necessarily find that Florida's licensing law is applicable to subcontractors working on a federal project, thereby empowering Florida to second-guess the federal government's responsibility determination.[13] (*See* Doc. 117-2 at 16–17; Doc. 138 at 4–5); *Leslie Miller*, 352 U.S. at 190.

Florida Statutes § 489.103 carves out exceptions to Florida's licensing law. Thus, the Court must also look to these exceptions when deciding whether Timberline's argument has merit. In particular, the Court focuses on Florida Statutes § 489.103(8), which exempts "[a]ny construction, alteration, improvement, or repair carried on within the limits of any site the title to which is in the United States *or with respect to which federal law supersedes this part*." Fla. Stat. § 489.103(8) (emphasis added). Necessarily, this provision requires the Court to consider whether federal law superseded Florida's licensing requirement as applied to the Project. For the reasons above, the Court determines that it did. Accordingly, Florida's licensing requirement did not apply to APTIM in the context of the Project. Nor, then, can the licensing requirement apply to APTIM's state law claims arising out of the Project or, more specifically, out of its dealings with Timberline. *See* Fla.

---

[12] Relatedly, Timberline contends that, because the USACE did not determine APTIM's responsibility, cases like *Leslie Miller* and *Gartrell* are inapposite. (*See* Doc. 117-2 at 15, 18.) This argument misses the point of *Leslie Miller* and *Gartrell*—and ignores the thrust of all other relevant cases. The issue is not whether, in the instant case, the state sought to interfere with the federal government's responsibility determination. Rather, the issue is that the rule which Timberline wishes to enshrine *enables* the state to so interfere. *See, e.g.*, *Flickinger*, 485 P.2d at 549 ("The burden which may be imposed could in some instances frustrate the express federal policy. It is not the fact that there may not be a conflict concerning subcontractors' responsibility; it is the fact that there may be."). As explained above, Timberline's interpretation, (*see* Doc. 117-2 at 16–17; Doc. 138 at 4–5), necessarily gives the state a "virtual power of review over the federal determination of 'responsibility,'" *see Leslie Miller*, 352 U.S. at 190.

[13] To the extent that Timberline means to argue that "unenforceability" can only be raised in a case such as this (i.e., where one private party sues another after the completion of all work), (*see* Doc. 138 at 2–3), the Court notes that Florida's licensing law is intended to protect the public from shoddy work, *see* Fla. Stat. § 489.101. Given this purpose, it simply would not make sense if the state could not enforce the law against subcontractors working on federal projects before or during performance, but the subcontractors themselves could invoke the unenforceability provision in personal disputes post-performance. *Cf. Poole & Kent Co.*, 759 So. 2d at 6 ("We have considerable doubt that the legislature intended this statute to be used . . . to avoid payment by the general contractor for work actually performed by a subcontractor on a public works project.").

Stat. § 489.103(8); *see also Order* (Doc. 63) at 1–2, 8, *John T. Callahan & Sons, Inc. v. Associated Constr., Inc.*, No. 6:03-CV-00637-GAP-KRS (M.D. Fla. May 14, 2004) ("The Army Corps of Engineers, a United States entity, owns the Project and hence no license is required for Callahan.").

V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Timberline's *Motion for Summary Judgment* (Doc. 117) is **DENIED**.

Signed in Baton Rouge, Louisiana, on February 4, 2026.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**