### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA,**
*for the use and benefit of*
**TIMBERLINE CONSTRUCTION**
**GROUP, LLC**

                                          **CIVIL ACTION**

**VERSUS**

                                        **NO. 24-669-JWD-EWD**

**APTIM FEDERAL SERVICES, LLC,**
**ET AL.**

### RULING AND ORDER

This matter comes before the Court on APTIM's *Motion for Partial Summary Judgment* ("Partial *MSJ*") (Doc. 118) filed by APTIM Federal Services, LLC ("APTIM"). Timberline Construction Group, LLC ("Timberline") opposes the motion. (Doc. 134.) APTIM filed a reply. (Doc. 139.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, APTIM's Partial *MSJ* is granted.

## I.    RELEVANT BACKGROUND

### A.  Factual Background

Following Hurricane Ian, the United States Army Corps of Engineers ("USACE") undertook to build temporary housing ("the Project") in Lee County, Florida. (*Statement of Material Facts* ("*SMF*"), Doc. 118-1 at 1, ¶ 1.)[1] The USACE hired Brice Aptim JV, LLC ("BAJV") as general contractor. (*Id.*) BAJV subcontracted work to its member APTIM. (*Id.* at 1, ¶ 2.) In turn, APTIM subcontracted work to Timberline. (*Id.* at 1–2, ¶ 3.) Under the subcontract

---

[1] Unless otherwise indicated (e.g., with a qualifying record citation), when the Court cites the *Statement of Material Facts*, Timberline has admitted the cited material. *See* M.D. La. Civ. R. 56(f).

between APTIM and Timberline ("the Timberline Subcontract"), Timberline was to construct the Project's water, sewer, and drainage systems, among other improvements. (*See* Doc. 118-4 at 40.) The USACE's specifications for the Project incorporated the Lee County Utilities Operational Manual ("the Manual"). (*See, e.g.*, Doc. 118-5 at 131 n.1.) Section 3 of the Manual—titled "Sanitary Sewer Systems"—therefore controlled Timberline's work on the sewer system. (*Id.* at 146.) Section 3.4 opens: "It is imperative that all sanitary sewers and associated service lines be constructed watertight to prevent infiltration and/or exfiltration." (*Id.* at 157.)

### 1. *Timberline Subcontract*

The Timberline Subcontract provided that Timberline "shall supervise and direct the Subcontract Work, and shall cooperate with [APTIM] in scheduling and performing the Subcontract Work to avoid conflict, delay in, or interference with the Project, the [USACE], or [APTIM]." (Doc. 118-4 at 45.) Timberline had "the sole authority to control and direct the performance of the details of the Subcontract Work being rendered by its and its lower tier sub-subcontractors' employees." (*Id.* at 54.) "[T]he detail, manner and method of performing Subcontract Work [was] the responsibility of, and under the supervision and control of [Timberline] and its Subcontractors." (*Id.*) In addition, Timberline warranted that its work would

> be (i) of good quality and new, and free from defects and deficiencies (including with respect to, but not limited to, materials, construction, design, title and workmanship); (ii) fit for the purposes specified in the Subcontract or, where no such purpose [wa]s specified, fit for its ordinary purpose; (iii) performed in accordance with all law; (iv) performed in accordance with the specifications, requirements and conditions of the Subcontract; (v) performed in accordance with the Project schedule or otherwise timely; (vi) performed with a high degree of care and professional skill and diligence and (vii) sufficient to achieve the performance criteria (if any) set out in the Subcontract.

(*Id.* at 50.) Any work which did not conform to the above was "defective." (*Id.*) "[W]ithin 24 hours of discovering defective work or after receiving notice from [APTIM]," Timberline was required

to "proceed to take down and remove" all defective work and to "replace same with proper and satisfactory Subcontract Work." (*Id.*) Lastly, APTIM was authorized to terminate the Timberline Subcontract "by issuance of a written termination notice to [Timberline]" if

> *in [APTIM's] sole discretion*, any or all Subcontract Work to be performed under [the Timberline] Subcontract [wa]s abandoned by [Timberline]; or [Timberline] fail[ed] to meet its payroll or other current obligations, or allow[ed] any liens to attach to the site of the Subcontract Work or bonds; or the schedule of the Subcontract Work [wa]s not being maintained; or [Timberline] [wa]s in breach of or [wa]s otherwise violating any of the conditions, provisions, obligations, or representations contained in the[] [Terms & Conditions] or [the Timberline] Subcontract, in whole or in part; or [Timberline] [wa]s refusing or failing to perform properly any Subcontract Work; or [Timberline] [wa]s failing to provide the labor, supervision, tools, equipment or materials necessary for the prompt performance of the Subcontract Work or [wa]s failing to use due diligence in the performance thereof . . . .

(*Id.* at 58 (emphasis added).)

Absent any state laws governing the contract between the USACE and BAJV ("the Prime Contract"), the Timberline Subcontract was to be "governed by and interpreted pursuant to the rules and laws of the state" where the Prime Contract work was performed. (*Id.* at 61.) The Prime Contract provided only that "United States law will apply to resolve any claim of breach." (Doc. 118-3 at 169.) The parties therefore agree that Florida law governs the Timberline Subcontract. (*See* Doc. 118-2 at 7 ("Florida contract law will supply the key princip[le]s applicable here."); Doc. 134 at 13, 23 (applying Florida's implied covenant of good faith and fair dealing).)

### 2. *Timberline's Performance*

The USACE issued a "Notice to Proceed" with the Project on April 21, 2023. (Doc. 136-4 at 1–2.) The period of performance was 60 days—from April 21 until June 20, 2023. (*Id.*) On May 6, 2023, Timberline notified APTIM of "potential delays in the schedule due to unforeseen conditions," including a layer of limestone rock, changes to the design of the Project, and "design issues" like "incorrect elevations" and "unidentified existing systems/structures." (Doc. 136-8 at

3

1–2; *see also* Doc. 134-1 at 20, ¶ 7.) Timberline reserved its right to seek an extension of time for performance and advised that it would (1) keep APTIM apprised of delays and (2) "diligently seek to minimize . . . the effects of the[] [existing] delays on [Timberline's] work." (Doc. 136-8 at 2.)

On May 25, 2023, APTIM sent a cure notice to Timberline via e-mail. (Doc. 118-7 at 1–2.) That notice expressed concern that, "based on the level of resources . . . on site," Timberline would not meet its deadline. (*Id.* at 2.) It also informed Timberline that APTIM would "mobilize" its own resources in order to assist Timberline. (*Id.*) APTIM was entitled to do so under the Timberline Subcontract. (*See* Doc. 118-4 at 60.) As directed by the cure notice, Timberline provided APTIM with a corrective action plan on May 26, 2023. (Doc. 118-1 at 2, ¶ 6.) That plan indicated that Timberline was already working on the sewer system and estimated completion thereof by June 6, 2023. (Doc. 118-7 at 5.) It also explained that, by May 30, 2023, Timberline expected to have approximately 16 employees working on site. (*Id.* at 6.) Between May 25 and May 29, 2023, Timberline had 17–18 employees on site. (Doc. 118-1 at 3, ¶ 11.) APTIM "did not have a single operator or laborer on site" on May 27, 2023. (*Id.* at 3, ¶ 12.) It had one operator on site on May 28, 2023. (*Id.*) And it had one operator and one laborer on site on May 30, 2023.[2] (*Id.*)

On May 29, 2023, the USACE sent BAJV a letter expressing concern over "significant deficiencies" with "the [P]roject's underground utilities." (Doc. 118-7 at 9.) The USACE attributed at least some of the defective work to "lack of proper equipment" and "lack of qualified personnel," as well as failures of quality control. (*Id.*) APTIM forwarded this letter to Timberline on May 30, 2023. (Doc. 118-9 at 1–3.) Subsequently, on June 1, 2023, a Lee County inspector noted that "no

---

[2] The parties do not mention May 29, 2023. (*See, e.g.*, Doc. 118-1 at 3, ¶¶ 11–12 (citing Doc. 118-3 at 517–31).) Having examined the record, the Court observes that the "Daily Log of Construction" cited by APTIM jumps from Sunday, May 28 to Monday, *May 30*. (Doc. 118-3 at 524–25.) May 30 fell on a Tuesday in 2023. Presumably, then, when the parties discuss the number of APTIM operators and laborers on-site on May 30, they are actually discussing the number of APTIM operators and laborers on-site *on May 29*. But because the "Daily Log of Construction" does not clearly indicate whether the day of the week or the date itself is incorrect—and because the parties do not dispute the facts which rely on this record citation—the Court will use May 30, same as the parties.

less than ten sewer service laterals were incorrectly installed and required rework." (Doc. 118-1 at 3, ¶ 13.) In addition, this inspector "personally observed laterals being installed in violation of Lee County specifications." (*Id.*) Timberline was performing this defective work. (*Id.* at 4, ¶ 16.) At the USACE's direction, incorrectly installed lines were "ripped out and replaced." (*Id.* at 4, ¶ 15.)

On June 8, 2023, APTIM issued a second cure notice to Timberline. (Doc. 118-7 at 19–20.) The subject line read: "CURE NOTICE – Failure to Construct, Failure to provide appropriate and trained personnel, Failure to meet technical project requirements without re-work." (*Id.* at 19 (emphasis omitted).) The notice identified defective work performed on multiple occasions, including on June 8 and "[d]uring the first visit by Lee County, on June 1." (*Id.* at 19–20.) APTIM warned that "**[a] single additional instance of re-work caused by Timberline's inability to construct accurately and in accordance with specifications and schedule w[ould] result in immediate termination for default**." (*Id.* at 20 (emphasis in original).) APTIM requested that Timberline submit another corrective action plan. (*Id.*)

In its second corrective action plan, Timberline assured APTIM that it "ha[d] the resources, skilled trades, and management" to perform "in accordance with the plans and specifications and within the contract period of performance." (*Id.* at 21.) It pointed, however, to "delays beyond [its] control," including "unquantifiable delays . . . caused by BAJV personnel added to 'assist' Timberline." (*Id.*) Timberline suggested that the defective work on June 8 "could have been avoided if APTIM and Br[i]ce's personnel were not involved in the construction activities." (*Id.*) As for the defective work on June 1, Timberline acknowledged that it had "misinterpreted the plans," although it blamed this mistake on "drawing inconsistencies." (*Id.* at 22.) Timberline added that neither the USACE nor BAJV had "raise[d] concerns about improperly installed sewer lines

during the installation." (*Id.*) Lastly, Timberline reiterated that it "c[ould] complete th[e] work as required by the plans and specifications and within the required timeline." (*Id.*)

Subsequently, the Lee County inspector performed "a couple" of pressure tests in order to ensure that the sewer system was watertight. (Doc. 118-10 at 12–13; *see also* Doc. 118-5 at 146, 157 ("It is imperative that all sanitary sewers and associated service lines be constructed watertight to prevent infiltration and/or exfiltration.").) The sewer system failed these pressure tests and therefore was "not acceptable to Lee County." (Doc. 118-10 at 13.) Timberline was present for the failed tests. (*Id.*) Additionally, Timberline noted in its Daily Reports from June 21 through June 24, 2023, that it was finding and repairing sewer leaks. (Doc. 118-7 at 54, 70, 105, 109, 157, 186.)

APTIM and Brice assigned employees to "supplement Timberline's . . . work" on the sewer system. (Doc. 136-32 at 7–8.) The parties dispute whether and to what extent APTIM and Brice employees worked in their own crews, as opposed to being under Timberline's supervision. (*Compare* Doc. 118-15 at 4–5, *with* Doc. 136-34 at 8–9, 13; Doc. 136-35 at 6; Doc. 136-36 at 7.) Regardless, these APTIM and Brice employees seemingly worked extensively on the sewer mains. (*See, e.g.*, Doc. 136-33 at 3; Doc. 136-34 at 10; Doc. 136-35 at 3–5; Doc. 136-36 at 5; Doc. 136-39 at 3–4; Doc. 136-41 at 5–6.) However, the Lee County inspector testified that, when he visited the site, "[i]t was Timberline doing most of the sewer line work"—both to the sewer mains and to the sewer laterals. (Doc. 118-10 at 5.) According to the inspector, Timberline's employees were readily identifiable because "[t]hey had their Timberline shirts on." (*Id.* at 5–6.) At the time, the inspector did not see APTIM or Brice employees working on the sewer line. (*Id.* at 6.)

While on site, Timberline "attended meetings with [the] USACE where [the USACE] was critical of the [Project's] infrastructure construction." (Doc. 118-1 at 8, ¶ 41.) Further, the USACE "regularly requested" that BAJV's responsible manager "accompany [the] USACE into the field

6

to look at deficiencies in Timberline's work." (*Id.* at 8, ¶ 42; *see also* Doc. 118-14 at 6–7 (explaining that the USACE was "severe[ly] frustrat[ed]" with Timberline and was "on board and agreed with terminating Timberline").)

On June 23, 2023, APTIM sent Timberline a "Notification of Breach of Contract," explaining that the period for "substantial completion" of the Project had already elapsed and that "[Timberline's] performance ha[d] resulted in a delay which forecast[] [late] completion of the [P]rime [C]ontract . . . and therefore [wa]s in breach." (Doc. 118-7 at 190–91.) Then, on June 25, 2023, APTIM informed Timberline via e-mail that it was terminating the Timberline Subcontract. (Doc. 118-4 at 66.) A more formal "Notice of Termination for Default" followed on June 27, 2023. (Doc. 118-7 at 192–93.) In that notice, APTIM explained that it was terminating Timberline for "the continued performance and schedule issues addressed with Timberline" via on-site meetings and correspondence. (*Id.* at 192.) "At the time Timberline was terminated, Lee County had not accepted any of the work performed by Timberline on the sewer lines." (Doc. 118-1 at 8, ¶ 40.)

### B. Procedural Background

Timberline filed suit against APTIM in the Middle District of Florida on August 11, 2023. (Doc. 1.) On August 15, 2024, the Middle District of Florida transferred the case to this Court due to a forum-selection clause in the Timberline Subcontract. (Doc. 66.) Shortly before transfer—on July 31, 2024—Timberline filed its *Third Amended Complaint* (Doc. 63), bringing claims against APTIM for, *inter alia*, breach of contract and breach of the implied covenant of good faith and fair dealing. (Doc. 63 at 13, 15–16.) Both of these claims allege that APTIM improperly terminated Timberline for default. (*Id.*) The parties have sought a bench trial in the present case. On August 29, 2025, APTIM filed the instant motion, seeking partial summary judgment "on the issue of whether APTIM properly terminated, for cause, its contract with [Timberline]." (Doc. 118-2 at 1.)

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

"A movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." (emphasis in original))). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (quoting *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the movant bears its burden of showing that there is no genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations omitted) (quoting Fed. R. Civ. P. 56(e)). The nonmovant's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a

scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (cleaned up).

Additionally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (quoting, *inter alia*, *Ragas*, 136 F.3d at 458); *see also Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (rejecting the position "that the entire record in the case must be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

"[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted). Finally, the Fifth Circuit has explained:

> "[A] district court has somewhat greater discretion to consider what weight it will accord the evidence [presented on a motion for summary judgment] in a bench trial than in a jury trial." If a "[bench] trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district court properly should

'draw his inferences without resort to the expense of trial.'" However, the Fifth Circuit has cautioned that "a district court must be aware that assessments of credibility come into sharper focus" at the time of trial, therefore, "even at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result."

*Turner v. Pleasant*, No. 10-1823, 2013 WL 823426, at *7 (E.D. La. Mar. 6, 2013) (quoting *In re Placid Oil Co.*, 932 F.2d 394, 397–98 (5th Cir. 1991)); *accord In re Ecoserv*, No. 19-132, 2021 WL 26953, at *2 (M.D. La. Jan. 4, 2021) (Dick, C.J.); *see also In re Placid Oil Co.*, 932 F.2d at 398 ("We follow the *Nunez* court in recognizing that it makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts." (citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978))).

## III.    PARTIES' ARGUMENTS

### A.    APTIM's Partial MSJ (Doc. 118)

APTIM stresses that the only question currently before the Court is whether, in terminating the Timberline Subcontract, APTIM "exercised its sole discretion in good faith." (Doc. 118-2 at 1.) According to APTIM, it did. (*Id.*) Specifically, APTIM terminated the subcontract because Timberline engaged in "unsafe work practices," performed "defective[]" work, and "refus[ed] to procure a payment and performance bond." (*Id.* at 2.) Consequently, APTIM says, partial summary judgment is warranted, and the Court should "find[] that [APTIM] properly terminated Timberline for cause under the subcontract terms[,] with damages to be determined at trial." (*Id.*) APTIM notes also that Timberline "has failed to allege that APTIM acted in bad faith in exercising its sole discretion" to terminate Timberline. (*Id.* at 1 n.2.) Such a claim would require showing "that APTIM acted capriciously and that 'no reasonable party would have made the same discretionary

decision.'" (*Id.* at 2 (quoting *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) (cleaned up)).)

APTIM recites the following legal principles: First, the meaning of each contract provision is a question of law. (*Id.* at 7 (citing *Otis Elevator v. WG Yates & Sons Constr. Co.*, 589 F. App'x 953, 958 (11th Cir. 2014) (per curiam)).) Second, a court must read contract provisions "harmoniously," giving effect to each. (*Id.* (quoting *Devs. Sur. & Indem. Co. v. Archer W. Contractors, LLC*, No. 16-1875, 2018 WL 2100032, at *5 (M.D. Fla. May 7, 2018)).) And third, under Florida law, contracts "contain an implied covenant of good faith and fair dealing." (*Id.* (citing *Archer*, 2018 WL 2100032, at *8, *11).) This covenant limits "somewhat" provisions allowing parties to act in their "sole discretion." (*Id.* (emphasis omitted) (quoting *Ernie Haire Ford*, 260 F.3d at 1291).) A discretionary decision is made in bad-faith if "no reasonable party would have made [it]." (*Id.* (emphasis omitted) (quoting *Ernie Haire Ford*, 260 F.3d at 1291).) But otherwise, this "sole discretion" language affords "substantial leeway." (*Id.* (emphasis omitted) (quoting *Archer*, 2018 WL 2100032, at *11).)

APTIM argues that the Timberline Subcontract's "Termination for Default" provision allowed APTIM to terminate Timberline if, in APTIM's sole discretion, Timberline (1) breached the Timberline Subcontract in whole or in part; (2) "fail[ed] to perform properly any Subcontract Work"; (3) performed work "not in accordance with the terms of the Subcontract"; or (4) "fail[ed] to provide the labor, supervision, tools, equipment or materials necessary for the prompt performance of the Subcontract Work." (*Id.* at 8 (quoting Doc. 118-4 at 58).) In APTIM's view, it "had at least three legitimate reasons for terminating Timberline." (*Id.* at 9.)

### 1. *Defective Work*

First, Timberline's work (e.g., installing sewer lines, installing the reinforced concrete pipe used in the stormwater system) was defective. (*Id.* (referencing Doc. 118-4 at 50–51).) And despite receiving a cure notice on May 25, 2023, "Timberline failed to remedy" the defects. (*Id.* at 10; *see also id.* at 10–11 (citing Doc. 118-5 at 26–28; Doc. 118-7 at 1–8).)[3] On May 29, 2023, the USACE issued a "letter of concern" to APTIM, noting "significant deficiencies" with the sewer system, which "appeared to be the result of a lack of proper equipment . . . [and] qualified personnel." (*Id.* at 11 (quoting Doc. 118-7 at 9).) APTIM forwarded this letter to Timberline on May 30, 2023. (*Id.* (citing Doc. 118-9).) Then, on June 1, 2023, a Lee County inspector "personally observed" Timberline employees performing defective work. (*Id.* (citing Doc. 118-10 at 11–12).) Timberline admits that it was performing defective work on that day. (*Id.* at 11–12 (citing Doc. 118-5 at 32).)

On June 8, 2023, APTIM sent Timberline a second cure notice. (*Id.* at 12 (citing Doc. 118-7 at 19–20).) At that time, APTIM informed Timberline that "[a] single additional instance of re-work caused by Timberline's inability to construct accurately and in accordance with specifications and schedule w[ould] result in immediate termination for default." (*Id.* at 12 (emphasis omitted) (quoting Doc. 118-7 at 20).) Thereafter, the sewer lines installed by Timberline failed to pass the pressure tests required by the Timberline Subcontract. (*Id.* at 12–13 (citing, *inter alia*, Doc. 118-10 at 13; Doc. 118-7 at 47–193; Doc. 118-5 at 131 n.1).) "At the time Timberline was terminated, Lee County had not accepted *any* of the work performed by Timberline on the

---

[3] Throughout its brief, APTIM has cited "deposition exhibits" contained within larger submissions. (*See, e.g.*, Doc. 118-2 at 12 n.62.) In particular, APTIM makes frequent reference to deposition exhibits within Exhibit C. (*Id.*) Exhibit C is more than 1,200 pages long. Deposition exhibit numbers appear only on the first page of each deposition exhibit. APTIM has provided no other way to identify deposition exhibits, forcing the Court to search (repeatedly) for the needle in the haystack. The parties are reminded that it is not the job of this Court to sift through thousands of pages to find the parties' support for their respective positions. *See, e.g.*, M.D. La. Civ. R. 7(d), (f); *id.* 56(f); *see also Dunkel*, 927 F.2d at 956 ("Judges are not like pigs, hunting for truffles buried in briefs.").

12

sewer lines." (*Id.* at 14 (cleaned up) (citing Doc. 118-10 at 18).) "Without Lee County's acceptance

of the Subcontract Work, the sewer system could never be placed into service . . . ." (*Id.*)

APTIM draws parallels to *Developers Surety & Indemnity Co. v. Archer Western

Contractors, LLC*, where the court granted summary judgment in favor of a contractor which had

exercised its sole discretion in terminating a subcontractor, consistent with the subcontract terms.

(*Id.* at 14–15 (citing *Archer*, 2018 WL 2100032, at *11).) In that case, the court determined that

there was no genuine issue whether the contractor acted in good faith, in part because of the

"numerous documented complaints" as well as a Registered Landscape Architect Report

concerning the subcontractor's deficient work. (*Id.* (quoting *Archer*, 2018 WL 2100032, at *12).)

APTIM observes that, here, Timberline's performance was likewise defective. (*Id.* at 15–16.)

Thus, APTIM contends, it "properly exercised its sole discretion in terminating the Subcontract."

(*Id.* at 16.) It emphasizes that it gave Timberline multiple opportunities to cure. (*See id.* at 16–17;

*see also id.* at 17–18 (citing, *inter alia*, Doc. 118-12 at 2–3; Doc. 118-7 at 11–15) (adding that

there were multiple "on-site discussions about Timberline's failures" and that Timberline was "on

site when its noted deficiencies occurred").)

### 2. *Unsupervised, Unskilled, Unsafe Work*

Second, APTIM argues that, despite Timberline's representations that it was "fully skilled

and experienced 'in all work necessary to successfully complete the Subcontract Work,' including

supervision," "no one at Timberline had operational control of the Subcontract Work." (*Id.* at 21–

22 (emphasis omitted) (citing Doc. 118-4 at 50).) Further, "most of Timberline's subcontractors

for this project were not skilled laborers." (*Id.* at 23 (citing Doc. 118-5 at 20–21).) APTIM repeats

that the USACE suggested that "lack of qualified personnel" was a reason for the "significant

deficiencies" with the sewer system. (*Id.* at 22 (quoting Doc. 118-7 at 9).) It adds that Timberline was required to supply personnel under the Timberline Subcontract. (*Id.* (citing Doc. 118-4 at 39).)

Further, APTIM says, Timberline performed unsafe work, despite the Timberline Subcontract's requirement that Timberline "take reasonable safety precautions with respect to the performance of the Subcontract Work." (*Id.* at 23 (citing Doc. 118-4 at 50).) Specifically, one Timberline employee "failed to adhere to the warnings inside the cab of an excavator and broke the glass with the attached bucket." (*Id.* (citing Doc. 118-8 at 9–11).) Another "was operating an excavator and hit two sewer laterals, requiring rework." (*Id.* (citing, *inter alia*, Doc. 118-5 at 38).) And a third "was removed [from the Project] for hot fueling a water pump." (*Id.* (citing Doc. 118-8 at 11, 13, 55).) APTIM contends that "each instance of unsafe work . . . was . . . a good[-]faith reason for termination." (*Id.*) It reiterates that the USACE frequently complained about Timberline's performance. (*Id.* at 24 (citing, *inter alia*, Doc. 118-14 at 3–4).)

### 3. *Failure to Procure Bond*

Third, APTIM argues that Timberline failed to procure a payment and performance bond, despite being required to do so and despite "includ[ing] pricing for a bond in its proposal" to APTIM, as well as in an invoice dated May 15, 2023. (*Id.* at 24–25 (citing Doc. 118-5 at 10, 702–05).) According to APTIM, "the final specifications for the project required a performance bond." (*Id.* at 25 (citing Doc. 118-5 at 16–17, 338).) On June 23, 2023, APTIM demanded that Timberline "furnish the Payment and Performance bond or a letter of credit for the full contract value by June 24, 2023, or be held in default." (*Id.* (citing Doc. 118-7 at 190–91).) "Timberline presented no such bond and no credit for same." (*Id.*) APTIM claims that Timberline's failure here was "another contractually sound reason for termination." (*Id.* (citing *Logan & Clark, Inc. v. Adaptable Dev., Inc.*, 450 So. 2d 1189, 1190 (Fla. 4th DCA 1984) (per curiam)).)

### B. Timberline's Opposition (Doc. 134)

Timberline counters that, because the termination of a contract is a "drastic action," courts "require strict compliance with the terms of the relevant contract and that the terminating party first provide" adequate notice and an opportunity to cure. (Doc. 134 at 1.) Timberline denies that APTIM can show material breach, adequate notice, and an opportunity to cure. (*Id.* at 1.) "Termination would be improper because Timberline promptly began to repair each instance of non-conf[o]rming work once made aware." (*Id.*) Timberline also contends that APTIM is responsible for some of the defective work, both by doing such work itself and by refusing to give Timberline additional time for performance. (*Id.* at 1–2.) According to Timberline, termination for unsafe work was improper "because APTIM never stated [that] it [was] terminat[ing] Timberline for safety." (*Id.* at 2.) Likewise, termination for failure to procure a bond was improper "because the subcontract did not require Timberline to provide a bond until requested." (*Id.*)

Timberline reiterates that termination for cause is a "'drastic sanction' which should be imposed (or sustained) only for good grounds and on 'solid evidence.'" (*Id.* at 8 (quoting *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 371 (1999)); *see also id.* at 8–9 (citing 7 *Bruner & O'Connor on Construction Law* § 18:39 (2024) (citations omitted)).) Thus, "even when a contract does not explicitly require notice and an opportunity to cure, courts imply the requirement as a matter of law for construction contracts." (*Id.* at 9 (citing *Centerplan Constr. Co., LLC v. City of Hartford*, 343 Conn. 368, 412 (2022); 5 *Bruner & O'Connor on Construction Law* § 18:15 (2014)); *see also id.* (citing *MV Lady B, LLC v. Rolly Marine Serv. Co.*, No. 23-61769, 2024 WL 4881034, at *3–4 (S.D. Fla. Oct. 9, 2024)).) APTIM must therefore prove: (1) material breach, (2) "APTIM's lack of prior breach," (3) APTIM's good faith, (4) adequate notice, and (5) a reasonable opportunity to cure. (*Id.* at 9–10.)

### 1. *"Sole Discretion"*

First, Timberline disagrees that the Timberline Subcontract gave APTIM "sole discretion" to terminate Timberline for the reasons given and argues that "there is at least a question of fact as to Timberline's alleged default." (*Id.* at 7–8; *see also id.* at 10.) In Timberline's view, the relevant subcontract provision is "clear as mud." (*Id.* at 10.) But simultaneously, Timberline insists that the "sole discretion" language modifies "*only* the first item in the list." (*Id.*) Accordingly, APTIM could, in its sole discretion, determine that Timberline abandoned "any or all Subcontract Work" but not, e.g., that Timberline "perform[ed] Subcontract Work not in accordance with the terms of the Subcontract." (*Id.* at 11.) Timberline contends that this interpretation of the provision "is supported by the basic rules of contractual interpretation," explaining that, under the "proximity rule," "modifiers generally attach to the nearest reasonable word or phrase." (*Id.* (citing Bryan A. Garner, *Garner's Modern English Usage* 597 (4th ed. 2016)).) Timberline claims that "[t]here is no grammatical signal (*e.g.*, a colon) extending the modifier to the entire series." (*Id.* at 11–12.) Rather, the modifier "in [APTIM's] sole discretion" is "embedded within the first 'if' condition." (*Id.* at 11.)

Timberline gives additional reasons for its reading of the relevant provision. "Under parallelism rules, modifiers do not automatically 'float' across coordinate clauses unless repeated or clearly scoped." (*Id.* at 12 (quoting Garner, *Garner's Modern English Usage*, *supra*, at 670–71) (citing Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 10.50(b) (3d ed. 2013)).) And commas set off the "sole discretion" language, "mak[ing] it a parenthetical, [thereby] limiting its reach to its immediate clause." (*Id.* (citing Garner, *The Redbook*, *supra*, § 1.3).) At a minimum, Timberline says, the provision is ambiguous, in which case it must be construed against the drafter (i.e., APTIM). (*Id.* (citing *First Fin. N.W., Inc. v. Laver*, 410 So. 3d 1, 3 (Fla. 4th DCA 2025)).) It

therefore reiterates that "APTIM only had 'sole discretion' to determine whether Timberline abandoned, not whether it was in default for any other reason." (*Id.*)

### 2. Notice & Opportunity to Cure

Next, Timberline explains that the implied covenant of good faith and fair dealing "is a 'gap-filling default rule' which is 'usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards.'" (*Id.* at 13 (quoting *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004)).) It "cannot be used to vary the unambiguous terms of a written contract." (*Id.* (quoting *Avatar Dev. Corp. v. De Pani Constr., Inc.*, 834 So. 2d 873, 876 (Fla. 4th DCA 2002)).) Thus, Timberline argues, "all objective requirements still apply," meaning that APTIM must still "show notice, opportunity to cure, and lack of prior breach." (*Id.* (citing 7 *Bruner & O'Connor on Construction Law* § 18:39 (2024)).)

A cure notice must, according to Timberline, "fairly appraise the breaching party of the specific breaches considered to warrant termination." (*Id.* (quoting 7 *Bruner & O'Connor on Construction Law* § 18:41 (2024)).) "[I]nforming the other party of an issue, without indication that the non-breaching party is considering termination, is insufficient." (*Id.* at 14 (citing *Hannon Elec. Co. v. United States*, 31 Fed. Cl. 135, 148 (1994), *aff'd*, 52 F.3d 343 (Fed. Cir. 1995); *Eddystone Borough v. Peter V. Pirozzi Gen. Contracting, LLC*, No. 13-1470, 2015 WL 1542284, at *8 (E.D. Pa. Apr. 7, 2015)).)

### 3. Performance & Bond Procurement

Timberline contends that APTIM could not have properly or in good faith terminated Timberline for defective work "because Timberline promptly began to repair each and every instance of improper work of which it had knowledge." (*Id.*) According to Timberline, APTIM

must show not only that Timberline's work was defective but also that, in contravention of Section 11 of the Timberline Subcontract, Timberline failed to take remedial action within the appropriate timeframe. (*Id.* at 15.) Timberline avers that, in all cases, it timely took such action. (*Id.* (citing, *inter alia*, Doc. 136-32 at 9–18).) It also asserts that it was "actively working on repairs" to the sewer system but was terminated—without notice or an opportunity to cure—before those repairs could be completed. (*Id.* at 15–16 (citing Doc. 136-32 at 31; Doc. 136-39 at 6).)

In addition, Timberline argues that APTIM has not established that Timberline was responsible for all defective work, noting that APTIM and Brice both sent employees to supplement Timberline's work, including on the sewer system. (*Id.* at 16 (citing, *inter alia*, Doc. 136-32 at 7–8); *see also id.* at 16–17.) Specifically, Timberline says, APTIM and Brice employees "installed the entirety of the sewer mains except one portion." (*Id.* at 16 (citing, *inter alia*, Doc. 136-33 at 3–4).) Terminating the Timberline Subcontract "for defective work performed by APTIM's own employees cannot be a proper termination []or an exercise in good faith." (*Id.*) Finally, Timberline blames APTIM for "failing to provide Timberline additional time" to perform, which "contributed to quality issues" by forcing Timberline to "stack[]" tasks rather than to complete them "in a linear sequence." (*Id.* at 17 & n.1 (citing Doc. 136-33 at 12–13, 16–17, 18–20; Doc. 136-28 at 1–2).) Timberline contends that APTIM's failure was a breach of contract. (*Id.*)

Timberline further argues that APTIM has "take[n] [the] USACE's complaint regarding the 'lack of proper equipment' and 'lack of qualified personnel' out of context." (*Id.* at 17 (citing Doc. 118-2 at 22).) According to Timberline, the USACE's May 29 letter pertained to failures of quality control, for which APTIM was responsible. (*Id.* (citing Doc. 118-2 at 22; Doc. 136-32 at 3).) Timberline avers that it had proper equipment on-site, (*id.* (citing, *inter alia*, Doc. 136-33 at 4–7)), and that any issues with equipment and personnel were a consequence of the "compression

18

of the schedule," (*id.* (citing Doc. 136-33 at 16–20)). Lastly, Timberline claims that it had "[m]ultiple competent supervisors" on-site. (*Id.* at 17–18 (citing, *inter alia*, Doc. 136-34 at 3–7).)

Timberline denies that "meeting minutes, health and safety reports, and daily reports" constituted notice, because none of them indicated that "APTIM was considering terminating Timberline for the issues being raised." (*Id.* at 18 (citing 7 *Bruner & O'Connor on Construction Law* § 18:41 (2024)); *see also id.* at 18–19 (rehashing arguments).) And in any event, Timberline says, it "cured every instance of defective work of which it was aware." (*Id.*) Thus, there are "questions of fact as to whether APTIM properly and in good faith terminated Timberline for defective work." (*Id.* at 19.) Relatedly, Timberline argues that, prior to this litigation, APTIM did not "use Timberline's safety record as a reason for termination." (*Id.* (citing, *inter alia*, Docs. 136-12, 136-19, 136-23).) Consequently, "termination for that reason would be improper." (*Id.*) But regardless, the instances of unsafe work identified by APTIM were "[i]solated" and therefore "can hardly be considered a 'persistent' pattern . . . sufficient to constitute a material breach." (*Id.* at 20 (citing 7 *Bruner & O'Connor on Construction Law* § 18:28 (2024)).)

As for its failure to procure a bond, Timberline argues that (1) APTIM "did not terminate Timberline because it failed to provide a bond," and (2) "the Subcontract only required Timberline to provide a bond upon request." (*Id.* at 20–21 (citing Doc. 136-32 at 27–28, 30).) During its corporate deposition, APTIM did not identify failure to procure a bond as one of the reasons for terminating Timberline. (*Id.* at 21 (citing Doc. 136-32 at 27–28, 30).) And during performance of the Timberline Subcontract, when APTIM at last requested a bond from Timberline, Timberline promptly reached out to its surety. (*Id.* (citing Doc. 136-22 at 1).) The surety was willing to furnish a bond once APTIM provided a letter or e-mail stating that "a bond was required and was overlooked by the parties" and that "the job [wa]s on schedule and there [we]re no disputes." (*Id.*

at 22 (quoting Doc. 136-22 at 1).) Thus, when APTIM demanded that Timberline procure a bond in its June 23 "Notification of Breach of Contract," APTIM "knew that Timberline needed documentation from APTIM to do so." (*Id.*) Timberline therefore disputes that this demand for a bond was made in good faith. (*Id.*)

### 4. *APTIM's Lack of Good Faith*

Finally, Timberline argues that APTIM did not terminate the Timberline Subcontract in good faith. (*Id.* at 23.) Timberline acknowledges that, prior to the "Notice of Termination for Default," APTIM provided Timberline with multiple "Letters of Concern / Cure Notices." (*Id.* (citing Doc. 136-25).) Timberline also admits that such correspondence addressed delays, as well as defective work. (*Id.* at 23–24.) But Timberline emphasizes that "it was not until [APTIM] sent the 'Notification of Breach of Contract' that [it] formally held Timberline in default." (*Id.* at 24.) "[A]nd even then," Timberline says, "the default was limited to schedule and delays, which is [sic] now absent from APTIM's arguments." (*Id.* (citing Doc. 136-32 at 19–24).)

Timberline posits that the reason why APTIM has not cited delay as a basis for termination is that "BAJV requested and obtained 83 . . . additional days from [the] USACE *for the exact same issues [about which] Timberline complained*." (*Id.* (citing, *inter alia*, Doc. 136-29; Doc. 136-30; Doc. 136-38 at 5–13).) But simultaneously, Timberline speculates that "delay was not even the true motive for APTIM's wrongful termination [of Timberline]." (*Id.* (emphasis omitted).) Instead, Timberline suggests that APTIM "use[d] Timberline as a scapegoat . . . after [APTIM's] own poor management of the project resulted in six written complaints." (*Id.* at 24–25; *see also id.* at 25 (citing Doc. 136-27).) It directs the Court to an e-mail from BAJV's responsible manager:

> At this point, we [BAJV] had our free pass to remove Timberline and make good, but that card is now 3/4 out the window. The next to come is going to be a full deficiency in the [quality control] on the project as there are no more [subcontractors] to pass blame on, plus in my opinion we didn't respond strong

> enough, especially with all the continued repairs that are showing up. Complete
> [quality control] failure and incompetence is my guess on the big bomb that the
> hatches are open to launch any day. . . . [F]rom my perspective I do not see that the
> [quality control] was in place to prevent any of these massive failures.

(*Id.* (quoting Doc. 136-27 at 1); *see also id.* (quoting Doc. 136-26 at 1) ("[W]e are about to have

used up our one and only chance at redemption on this project . . . ." (emphasis omitted)).)

### C.  APTIM's Reply (Doc. 139)

APTIM reiterates that the only question before the Court is "whether APTIM exercised its

sole discretion in good faith." (Doc. 139 at 1.) It notes that Timberline "relies heavily on secondary

sources while ignoring case law from Florida directly on point." (*Id.* at 1 & n.2 (citing *Archer*,

2018 WL 2100032).) Specifically, APTIM explains that, in *Archer*, the court granted summary

judgment over an opposition which relied on a "hypertechnical view of 'notice'" and which alleged

that the general contractor (i.e., the movant) had "breached the Subcontract on numerous

occasions." (*Id.* at 2 (citing *Archer*, 2018 WL 2100032, at *7, *12).) "[F]inding 'numerous

documented complaints' against the subcontractor," the *Archer* court "was 'satisfied' that the

general contractor did not violate its duty of good faith." (*Id.* (citing *Archer*, 2018 WL 2100032,

at *12).) APTIM urges that *Archer* "clearly supports granting" the Partial *MSJ* here. (*Id.*)

In addition, APTIM says, Timberline's arguments merely distract from the issue at hand.

(*Id.*) "Timberline has failed to show that APTIM acted in bad faith, capriciously[,] or in

contravention of the parties' reasonable expectations." (*Id.* at 2–3 (citing *Mount Sinai Med. Ctr. of

Greater Miami, Inc. v. Heidrick & Struggles, Inc.*, 329 F. Supp. 2d 1309, 1313 (S.D. Fla. 2004),

*aff'd*, 188 F. App'x 966 (11th Cir. 2006)).) Put another way, Timberline has not shown that "no

reasonable party would have made the same discretionary decision" as APTIM. (*Id.* (emphasis

omitted) (quoting *Ernie Haire Ford*, 260 F.3d at 1291).)

21

APTIM observes that the "sole discretion" language in Section 25 of the Timberline Subcontract precedes items in a series (i.e., a list) and therefore contends that the language logically concerns the *entire* series. (*Id.* at 3 (citing Garner, *The Redbook*, *supra*, at § 1.18).) According to APTIM, case law supports this reading. (*Id.* at 4 (citing *United States v. Marshall*, 808 F. App'x 11, 14 (2d Cir. 2020) (summary order); *United States v. Loyd*, 886 F.3d 686, 688 (8th Cir. 2018); *Philadelphia Indem. Ins. Co. v. Bellin Mem'l Hosp.*, 126 F.4th 532, 539 (7th Cir. 2025)).) "The series-qualifier canon 'requires a modifier to apply to all items in a series when such an application would represent a natural construction.'" (*Id.* (quoting *Loyd*, 886 F.3d at 688).) APTIM argues that applying the "sole discretion" language to just the first item in the series "results in a nonsensical, unharmonious interpretation depriving the contract of its natural meaning." (*Id.* (citing, *inter alia*, *Kipp v. Kipp*, 844 So. 2d 691, 693 (Fla. 4th DCA 2003)).)

Next, APTIM denies that the implied covenant of good faith and fair dealing required it "to provide Timberline endless chances to cure its defective work." (*Id.* at 5.) The Timberline Subcontract was clear that "Subcontract Work not conforming to the[] requirements [of the subcontract] w[ould] be considered defective." (*Id.* (quoting Doc. 118-4 at 50).) And "[i]t is undisputed that there were continuous sewer leaks [which] Timberline failed to cure, and that the sewer lines failed multiple pressure tests." (*Id.* (citing Doc. 118-10 at 13).) Consequently, the Lee County inspector refused to accept Timberline's work. (*Id.* at 6 (citing Doc. 118-2 at 13).) APTIM also notes that the "Notification of Breach of Contract" specifically mentioned "schedule, performance, *and* . . . deficiencies in [Timberline's] subcontract work." (*Id.* (quoting Doc. 136-32 at 21).) APTIM adds that, because the sewer leaks were "continued defects," Timberline's arguments about lack of notice and an opportunity to cure are meritless. (*Id.* at 5 n.20.)

According to APTIM, it is irrelevant whether *APTIM* performed defective work on-site. (*Id.* at 6.) Under the Timberline Subcontract, Timberline was responsible for the work on the sewer system. (*Id.* at 6–7 (referencing Doc. 118-4 at 45).) APTIM could supplement Timberline's workforce, "while Timberline retain[ed] full authority over the execution of its contractual responsibilities." (*Id.* at 7.) Indeed, Timberline's superintendent was "in charge when defective work was performed." (*Id.* (citing Doc. 118-13 at 21–22).) Further, it was Timberline which "performed the deficient work that Lee County would not accept." (*Id.* at 6–7 (citing Doc. 118-5 at 32).) And it was Timberline which failed "to fix the leaks in the sewer system" from June 21–24. (*Id.* at 7 (citing Doc. 118-7 at 47–193).)

Penultimately, APTIM observes that the Timberline Subcontract provided for remediation of defects "within 24 hours of *discovering* defective work or after receiving notice." (*Id.* at 7–8 (emphasis added) (presumably, intending to quote Doc. 118-4 at 50)).) Thus, APTIM says, "'discovery' start[ed] the period of time in which an opportunity to cure [wa]s provided." (*Id.* at 8.) This interpretation is easy to square with the rest of the Timberline Subcontract, which did not require that notice be in writing. (*Id.*) But in any event "APTIM issued two formal cure notices, each allowing two weeks for Timberline to address the identified defects." (*Id.* (citing Doc. 118-7 at 1–2, 19).) And Timberline "readily admits" that it received formal notices from APTIM. (*Id.* at 7 (citing Doc. 134 at 5).)

APTIM argues that the Timberline Subcontract "did not provide any requirements for a 'proper' notice and opportunity to cure." (*Id.* at 8.) But the June 8 cure notice was in writing, identified itself as a cure notice, specified what Timberline needed to address, and warned that "termination for default was now on the table." (*Id.* at 8–9 (citing Doc. 118-7 at 19–20).) APTIM contests Timberline's invocation and use of an implied duty of notice and an opportunity to cure:

"To suggest that APTIM could only rely on defective work that Timberline did not repair [as a basis for termination] misses the point. It was the repeated discovery of defects that caused APTIM to put termination on the table in its June 8 notice and provided APTIM a basis to terminate the Subcontract on June 25." (*Id.* at 9.)

APTIM makes a number of observations related to the above. First, "it is not unusual for a construction contract to provide no pre-termination notice and no opportunity to cure." (*Id.* at 8 (emphasis omitted) (citing *Gibson v. Barron Dev. Corp.*, 2018 Fla. Cir. LEXIS 12094, at *4 (Fla. 11th Cir. Ct. Mar. 12, 2018)).) Second, where the Subcontract is silent, "federal courts have found that meeting minutes, phone calls, and verbal communication may constitute sufficient notice." (*Id.* at 9 (citing, *inter alia*, *Parkcrest Builders, LLC v. Hous. Auth. of New Orleans*, No. 15-1533, 2017 WL 3394033 (E.D. La. Aug. 8, 2017)).) Third, "Timberline was on site daily and had numerous conversations with APTIM, [the] USACE, and Lee County regarding the [sewer system] issues." (*Id.*) And fourth, "Timberline was actively discovering leaks through continued failed pressure tests." (*Id.* (citing Doc. 118-8 at 59, 62, 65).)

Finally, APTIM emphasizes that "Timberline was ultimately terminated for its defective work." (*Id.* at 10.) Whether Timberline should have been allowed additional time—and the fact that APTIM "never gave Timberline any additional time"—are not issues before the Court. (*Id.*)

## IV. DISCUSSION

### A. Extent of APTIM's "Sole Discretion"

#### 1. Interpretation of Contracts, Generally

"The interpretation of a contract is a legal conclusion." *Otis*, 589 F. App'x at 958 (citing *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003)). "[C]ontractual language is ambiguous only if it is susceptible to more than one *reasonable* interpretation."

*Seritage SRC Finance, LLC v. Town Ctr. at Boca Raton Tr.*, 397 So. 3d 44, 46 (Fla. 4th DCA 2024) (emphasis in original) (quoting *BKD Twenty-One Mgmt. Co. v. Delsordo*, 127 So. 3d 527, 530 (Fla. 4th DCA 2012)). Ambiguities must be "'construed against the drafter' of the [contract]." *First Fin. N.W.*, 410 So. 3d at 3 (quoting *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000)). But where one interpretation is sound and another "would be absurd," the sound interpretation applies. *Seritage*, 397 So. 3d at 46–47 (quoting *BKD Twenty-One*, 127 So. 3d at 530); *accord Kipp*, 844 So. 2d at 693 (citing *Katz v. Katz*, 666 So. 2d 1025, 1028 (Fla. 4th DCA 1996)) ("[A] court must construe a contract in a manner that accords with reason and probability . . . and [must] avoid an absurd construction.").

Similarly, courts must select an interpretation that gives force to all contractual provisions "over an alternative interpretation that relies on negation of some of the . . . provisions." *Pierce Law Grp., LLP v. Factor*, 408 So. 3d 148, 151 (Fla. 3d DCA 2025) (quoting *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 739 (Fla. 2002)). In doing so, courts must ordinarily "give words and phrases . . . the[ir] natural meaning[s] or th[ose] meaning[s] most commonly understood" given the context. *Rupp Hotel Operating Co. v. Donn*, 29 So. 2d 441, 445 (Fla. 1947); *accord Kipp*, 844 So. 2d at 693 (citing *McIlmoil v. McIlmoil*, 784 So. 2d 557, 561 (Fla. 1st DCA 2001)). Ultimately, the court's role is to enforce the contract, not to "rewrite [it] to make it more reasonable for one of the parties." *KRG Oldsmar Project Co., LLC v. CWI, Inc.*, 358 So. 3d 464, 468 (Fla. 2d DCA 2023) (quoting *Snyder v. Fla. Prepaid Coll. Bd.*, 269 So. 3d 586, 592 (Fla. 1st DCA 2019)); *accord Ernie Haire Ford*, 260 F.3d at 1290 ("[I]t is well settled that 'when the terms of a voluntary contract are clear and unambiguous, . . . the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous

for one of the contracting parties.'" (quoting *Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. 2d DCA 1995))).

### 2.  *Series-Qualifier Canon*

"Typically, 'a modifier at the beginning . . . of a series of terms modifies all terms.'" *Marshall*, 808 F. App'x at 14 (quoting *United States v. Lockhart*, 749 F.3d 148, 152 (2d Cir. 2014), *aff'd*, 577 U.S. 347 (2016)); *accord Loyd*, 886 F.3d at 687–88 (citing *Lockhart*, 577 U.S. at 355) (explaining that the series-qualifier canon "requires a modifier to apply to all items when such an application would represent a natural construction"); *see also Facebook, Inc. v. Duguid*, 592 U.S. 395, 403 (2021) ("The [Supreme] Court often applies this interpretive rule, usually referred to as the 'series-qualifier canon.'"); *cf. id.* at 403–04 ("A qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." (cleaned up) (quoting W. Eskridge, *Interpreting Law: A Primer on How To Read Statutes and the Constitution* 67–68 (2018))).

In *Philadelphia Indemnity Insurance Co. v. Bellin Memorial Hospital*, for example, the relevant insurance policy defined a "wrongful act" as "a negligent act, error, or omission." 126 F.4th at 539. The Seventh Circuit explained that the definition "follows a familiar structure of a modifier preceding a list of nouns." *Id.* at 540. "Grammar rules dictate that when 'a straightforward, parallel construction that involves all nouns or verbs in a series' is preceded by a modifier, that modifier 'normally applies to the entire series.'" *Id.* (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)); *accord Anhui Powerguard Tech. Co., Ltd. v. DRE Health Corp.*, 95 F.4th 1146, 1149–50 (8th Cir. 2024) (citing *State v. Champagne*, 561 S.W.3d 869, 873 (Mo. Ct. App. 2018)). "This interpretive rule, known

as the series-qualifier canon, generally provides the most natural reading of a sentence." *Philadelphia Indem.*, 126 F.4th at 540; *accord Facebook*, 592 U.S. at 403.

Likewise, the Eleventh Circuit and Florida courts have implicitly and explicitly applied the series-qualifier canon when interpreting contracts. *See, e.g.*, *ECB USA, Inc. v. Chubb Ins. Co. of N.J.*, 113 F.4th 1312, 1322 (11th Cir. 2024) ("[The canon] reflects the unremarkable convention that '[w]hen several words are followed by a clause [that] [] is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all.'" (quoting *Paroline v. United States*, 572 U.S. 434, 447 (2014))); *see also Archer*, 2018 WL 2100032, at *2, *11 (considering a conditional sentence similar to the one at issue here); *cf. Davis v. Verandah at Lake Grady Homeowners Ass'n, Inc.*, 354 So. 3d 1140, 1144–45 (Fla. 2d DCA 2023) ("Since 'of record' appears in the middle of the list, the series[-]qualifier canon does not apply here."). *Ernie Haire Ford, Inc. v. Ford Motor Co.*, for example, concerned a "dealership agreement" which provided: "[Appellee] reserves the right to determine, from time to time, *in its best judgment*, the numbers, *locations* and sizes of authorized dealers necessary for proper and satisfactory sales and service representation . . . ." 260 F.3d at 1289 (emphasis in original). The Eleventh Circuit agreed with the district court that "[u]nder the [contract], it [wa]s [Appellee's] *own* judgment that control[led] . . . in determining the *relocation* of its dealerships." *Id.* at 1291 (second emphasis added). In other words, both courts applied the modifier "in its best judgment" to the second noun in the series (i.e., "locations"). *See id.* at 1289, 1291.

### 3. *Analysis*

Preliminarily, the Court considers the extent of the application of the "sole discretion" language appearing in Section 25 of the Timberline Subcontract. (*See* Doc. 118-4 at 58.) Again, the relevant portion of that section reads:

> If, in [APTIM's] sole discretion, any or all Subcontract Work to be performed under [the Timberline] Subcontract [wa]s abandoned by [Timberline]; or [Timberline] fail[ed] to meet its payroll or other current obligations, or allow[ed] any liens to attach to the site of the Subcontract Work or bonds; or the schedule of the Subcontract Work [wa]s not being maintained; or [Timberline] [wa]s in breach of or [wa]s otherwise violating any of the conditions, provisions, obligations, or representations contained in the[] [Terms & Conditions] or [the Timberline] Subcontract, in whole or in part; or [Timberline] [wa]s refusing or failing to perform properly any Subcontract Work; or [Timberline] [wa]s failing to provide the labor, supervision, tools, equipment or materials necessary for the prompt performance of the Subcontract Work or [wa]s failing to use due diligence in the performance thereof, [APTIM could], without notice to [Timberline's] sureties and without prejudice to or limiting other remedies as may be available to [APTIM], terminate [the Timberline] Subcontract . . . by issuance of a written termination notice to [Timberline].

(*Id.*) This lengthy sentence is a conditional. The "if" clause contains items in a series.[4] Because these items are complex—that is, because they feature internal punctuation and/or conjunctions—they are separated by semicolons rather than commas, consistent with the rules of English grammar. *See, e.g.*, Bryan A. Garner, *The Redbook: A Manual on Legal Style* §§ 1.3(b), 1.18(b) (4th ed. 2018).

The modifier "in [APTIM's] sole discretion" precedes all items in the series. (Doc. 118-4 at 58.) It can apply as naturally to the last item as to the first. *See ECB USA*, 113 F.4th at 1322. Indeed, it would be *unnatural* if APTIM had "sole discretion" to determine whether Timberline abandoned the Subcontract Work but not, e.g., whether the schedule was being maintained or whether Timberline "[wa]s refusing or failing to perform properly any Subcontract Work." (*See* Doc. 118-4 at 58); *see also Seritage*, 397 So. 3d at 46–47; *Kipp*, 844 So. 2d at 693. Consequently, this conditional sentence is unambiguous (i.e., not "susceptible to more than one *reasonable*

---

[4] It seems to the Court indisputable that the items form a series. (*See also* Doc. 134 at 12 (describing the items as a "series of seven 'if' conditions joined by *or*").) But at least one reason for this reading is that the items are parallel constructions which "pertain to a common subject matter," *viz.*, the bases for terminating Timberline. *See Anhui*, 95 F.4th at 1150; *see also Philadelphia Indem.*, 126 F.4th at 540 ("The Supreme Court has said that the most natural way to view a modifying term is as applied to the entire clause when that 'clause hangs together as a unified whole.'" (quoting *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 440 (2018))).

interpretation"). *See Seritage*, 397 So. 3d at 46; *see also ECB USA*, 113 F.4th at 1322 ("[T]he natural construction of the language *demands* that the clause be read as applicable to all." (emphasis added) (quoting *Paroline*, 572 U.S. at 447)). The series-qualifier canon applies, so the "sole discretion" language modifies all items in the series. *See, e.g.*, *Ernie Haire Ford*, 260 F.3d at 1289 (applying the modifier "in its best judgment" to the second noun in a series); *Archer*, 2018 WL 2100032, at *2, *11 (applying the "sole discretion" language to the last item in a series).

Lastly, the series uses the disjunctive "or." (Doc. 118-4 at 58.) Thus, if APTIM determined, in its "sole discretion," that Timberline had violated *any* condition in the series, then it could terminate the Timberline Subcontract "by issuance of a written termination notice to [Timberline]." (*Id.*) While this conditional sentence vested APTIM with considerable power, it is not the Court's prerogative to rewrite the contract "to make it more reasonable" for Timberline. *See KRG Oldsmar*, 358 So. 3d at 468; *Ernie Haire Ford*, 260 F.3d at 1290.

### B. APTIM's Good Faith

#### 1. *Implied Covenant of Good Faith and Fair Dealing*

"Under Florida law, the implied covenant of good faith and fair dealing is part of every contract." *Archer*, 2018 WL 2100032, at *8 (quoting *Burger King v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999)). This rule is "gap-filling," "usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Publix Super Mkts.*, 876 So. 2d at 654–55 (citing *Sepe*, 761 So. 2d at 1185). It prohibits the parties to a contract from "capriciously exercis[ing] discretion accorded . . . under [the] contract so as to thwart the contracting parties' reasonable expectations." *Ernie Haire Ford*, 260 F.3d at 1291 (citing, *inter alia*, *Sepe*, 761 So. 2d at 1185).

The implied covenant of good faith and fair dealing necessarily concerns "the performance of a specific contractual obligation." *Ernie Haire Ford*, 260 F.3d at 1291 (quoting *Johnson Enters. of Jacksonville, Inc. v. FPL, Grp., Inc.*, 162 F.3d 1290, 1314 (11th Cir. 1998)). Importantly, though, it "cannot override an express contractual term." *Id.* (citing *Ins. Concepts & Design, Inc. v. Heathplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001)); *accord Archer*, 2018 WL 2100032, at *8. Nor can it "be used to create a breach of contract . . . where there was no breach of any express term of the contract." *Avatar Dev. Corp.*, 834 So. 2d at 876. In other words, the implied covenant "is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Id.* (quoting *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 574 (Fla. 4th DCA 1998) (per curiam)).

Where a contract vests one party with the power to make a determination in its "sole discretion," the parties' expectations as to that determination "should 'reasonably' be more limited." *Sepe*, 761 So. 2d at 1185; *accord Sembler Fam. Partnership No. 41, Ltd. v. Brinker Fla., Inc.*, 660 F. Supp. 2d 1307, 1312 (M.D. Fla. 2009) (explaining that "sole discretion" is a "high degree of discretion"). "Nevertheless, sole discretion does not permit a party to make a discretionary decision that violates the covenant of good faith." *Id.* (citing *Mesler v. Holly*, 318 So. 2d 530 (Fla. 2d DCA 1975)); *see also id.* at 1185 n.2 (collecting cases). In order to establish that a party's exercise of sole discretion violates the implied covenant of good faith and fair dealing, the other party must:

> demonstrate a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment, or negligence[,] but rather by a conscious and deliberate act, which unfairly frustrates the agreed upon common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.

30

*Mount Sinai Med. Ctr*, 329 F. Supp. 2d at 1313 (quoting *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000)). "Unless no reasonable party . . . would have made the same discretionary decision . . . , it seems unlikely that [a party's] decision would violate the covenant of good faith . . . ." *Ernie Haire Ford*, 260 F.3d at 1291 (quoting *Sepe*, 761 So. 2d at 1185).

### 2. *Analysis*

Timberline bears a heavy burden. Namely, it must show that a reasonable trier of fact could find that APTIM "capriciously exercise[d] discretion accorded it under the contract so as to thwart the contracting parties' reasonable expectations." *See Ernie Haire Ford*, 260 F.3d at 1291. Or, put another way, Timberline must show that a reasonable trier of fact could find that "no reasonable party" would have terminated the Timberline Subcontract. *See id.* Largely, Timberline contests APTIM's Partial *MSJ* by raising related issues, including whether Timberline was actually in default, whether APTIM gave Timberline adequate notice and a reasonable opportunity to cure, and whether APTIM materially breached the Timberline Subcontract first. (*See* Doc. 134 at 7–8. *But see id.* at 23–25 (straightforwardly discussing the implied covenant of good faith).) Having carefully considered Timberline's arguments, the Court finds that they do not move the needle.

### a. Timberline's Defective Work

Timberline raises the possibility that APTIM was responsible for some of the defective work for which Timberline was ultimately terminated. (*See* Doc. 134 at 16 (citing, *inter alia*, Doc. 136-32 at 7–8).) But even assuming that Timberline is correct, there remains no genuine issue as to the following: First, Timberline was hired to construct the Project's sewer system. (*See, e.g.*, Doc. 118-4 at 40.) The Project commenced on April 21, 2023. (Doc. 136-4 at 2.) It was not until May 25, 2023, that APTIM announced that it was "mobiliz[ing]" its own resources to assist Timberline. (Doc. 118-7 at 1–2.) And even then, APTIM had no more than one operator and one

laborer on-site from May 25 through May 30, 2023. (Doc. 118-1 at 3, ¶ 12.) Before APTIM's employees began working on-site—and from May 25–30—Timberline was already installing the sewer system. (*See, e.g.*, Doc. 118-6 at 78, 121–23, 202, 314; Doc. 118-7 at 5–6.)

In its May 29 letter to BAJV, the USACE expressed concern over "significant deficiencies" with "the [P]roject's underground utilities," including the sewer system. (Doc. 118-7 at 9.) The letter identified specific instances of defective work and attributed at least some of them to "lack of proper equipment" and "lack of qualified personnel." (*Id.*) Necessarily, it would have been Timberline's employees who were performing defective work on the sewer system at this time.

Second, while on site on June 1, 2023, a Lee County inspector determined that "no less than ten sewer service laterals were incorrectly installed and required rework." (Doc. 118-1 at 3, ¶ 13.) As well, this inspector "personally observed laterals being installed in violation of Lee County specifications." (*Id.*) Timberline has admitted that it performed this defective work. (*Id.* at 4, ¶ 16.) In its second corrective action plan, Timberline acknowledged that it had "misinterpreted the plans" for these laterals, although it blamed "drawing inconsistencies." (Doc. 118-7 at 22.) These incorrectly installed sewer lines had to be "ripped out and replaced." (Doc. 118-1 at 4, ¶ 15.)

Third, APTIM issued its second cure notice to Timberline on June 8, 2023. (Doc. 118-7 at 19–20.) This notice warned that "[a] single additional instance of re-work caused by Timberline's inability to construct accurately and in accordance with specifications and schedule w[ould] result in immediate termination for default." (*Id.* at 20 (emphasis omitted).) Subsequently, the same Lee County inspector performed multiple pressure tests of the sewer system. (Doc. 118-10 at 12–13.) Timberline was present for these tests. (*Id.* at 13.) The sewer system failed, meaning that it was "not acceptable to Lee County." (*Id.*) In its Daily Reports from June 21 through June 24, 2023, Timberline noted that it was finding and repairing sewer leaks. (Doc. 118-7 at 54, 70, 105, 109,

157, 186.) Timberline admits that, when it was terminated, "Lee County had not accepted any of the work performed *by Timberline* on the sewer lines." (Doc. 118-1 at 8, ¶ 40 (emphasis added).)

Under the Timberline Subcontract, "the detail, manner and method of performing Subcontract Work [was] the responsibility of, and under the supervision and control of [Timberline] and its Subcontractors." (Doc. 118-4 at 54.) Also under the subcontract, Timberline warranted that the Subcontract Work would be (1) "of good quality and new, *and free from defects and deficiencies* (including with respect to, but not limited to, materials, construction, design, title and workmanship)" and (2) "performed in accordance with the specifications, requirements and conditions of the Subcontract." (*Id.* at 50 (emphasis added).) Any work which did not conform to the above was "defective." (*Id.*)

It bears repeating: Here, the question is not whether Timberline was objectively in default, but whether APTIM breached the implied covenant of good faith and fair dealing in determining, in its sole discretion, that Timberline had performed defective work. (*See* Doc. 118-4 at 58.) In order to survive summary judgment, Timberline must do more than simply sow doubt about whether some (or even most) of the defective work on the sewer system is attributable to APTIM. It must show that a reasonable trier of fact could find that APTIM acted "capriciously," or that "no reasonable party" would have terminated the Timberline Subcontract under the circumstances. *See Ernie Haire Ford*, 260 F.3d at 1291. Considering the above, Timberline has not carried its burden. That is, regardless of the issues which Timberline raises here, no reasonable trier of fact could find that APTIM was acting in bad faith when it terminated the subcontract.

*Archer* is a useful illustration of the plaintiff's burden when opposing a motion such as this. There, the general contractor, Archer, subcontracted Prince Land Services ("Prince") to perform landscaping and irrigation work on commuter rail stations in Florida. *Archer*, 2018 WL 2100032,

at *1. Eventually, Archer put Prince in default for "numerous alleged failures of performance." *Id.* at *2. It then made a claim on the bond which Prince's surety, DSIC, had issued. *Id.* at *1–2. DSIC sued. *Id.* at *4. Archer counterclaimed. *Id.* The parties ultimately filed cross-motions for summary judgment. *Id.* The district court granted Archer's motion for summary judgment, finding that Archer did not breach its implied duty of good faith and fair dealing. *Id.* at *8, *13.

One of DSIC's arguments in opposition to Archer's motion was that "genuine issues of material fact exist[ed] as to whether Prince [had] defaulted on the Subcontract." *Id.* at *11. The court rejected this argument, noting that Archer was authorized to take remedial action if it determined, "'at [i]ts sole discretion,' that Prince materially breached the Subcontract." *Id.* The court pointed to documentation of Prince's defective work, including punch lists, complaints, and a Registered Landscape Architect Report identifying "significant flaws in Prince's performance." *Id.* Although DSIC "filed an affidavit from Prince's principal stating that Prince complied with its obligations under the Subcontract," that "there was no basis for Archer to terminate Prince," and even that "*Archer* breached the Subcontract on numerous occasions," the court nevertheless concluded:

> In light of the numerous documented complaints regarding Prince's work, the punch lists documenting same, and [the] Report describing deficiencies in Prince's performance, the Court is satisfied that Archer's default of Prince did not violate its duty of good faith. That is, Archer's conduct was not "capricious[]," nor did it "contravene the reasonable contractual expectations of the other part[ies]. *See* [*Dep't of Revenue v. Gen. Motors LLC*, 104 So. 3d 1191, 1198 (Fla. 1st DCA 2012) (quoting *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097–98 (Fla. 1st DCA 1999)).] That Archer acted within its "discretion" when it terminated [Prince] for material breach of the Subcontract is not a genuine issue of material fact foreclosing summary judgment.

*Id.* (emphasis added). The instant motion follows this logic: Timberline cannot rely upon tangential issues, such as whether it was objectively in default or whether APTIM *also* performed defective work. Rather, Timberline must raise a genuine issue whether APTIM acted "capriciously" in

terminating the Timberline Subcontract. *See Ernie Haire Ford*, 260 F.3d at 1291; *accord Archer*, 2018 WL 2100032, at *12.

    b.  <u>Whether APTIM Breached First</u>

Somewhat related to the above, Timberline argues that unforeseen delays "contributed to quality issues" by forcing it to "stack[]" tasks rather than to complete them "in a linear sequence." (Doc. 134 at 17 & n.1 (citing Doc. 136-33 at 12–13, 16–17, 18–20; Doc. 136-28 at 1–2).) It posits that APTIM materially breached the Timberline Subcontract first—by "failing to provide Timberline additional time" for performance. (*Id.*; *see also id.* at 8–9 (citing 7 *Bruner & O'Connor on Construction Law* § 18:39 (2024)) (explaining that "termination of a construction contract may be upheld only if the terminating party meets its burden of proof that . . . the material breach was not induced, preceded, or otherwise excused by the terminating party's own supervening material breaches . . . .").)

It is "a fundamental principle of Florida contract law that a material breach by one party excuses . . . performance by the other." *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1300, 1309 (S.D. Fla. 2014) (citing *Indem. Ins. Corp. of DC. v. Caylao*, 130 So. 3d 783, 786 (Fla. 1st DCA 2014)). At the same time, however:

> There are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed on either side is continued in spite of a known excuse, the right to rely upon the known excuse is waived . . . .

*Id.* (quoting *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 859 (11th Cir. 2013) (Pryor, J., concurring in part and dissenting in part)); *accord* 13 *Williston on Contracts* § 39:31 (4th ed. 2025) ("A party to a contract may waive . . . a breach of the contract's provisions . . . by conduct manifesting a continued recognition of the contract's existence after learning of the breach or failure of the condition, such as by continuing to perform . . . ."); *Dunkin' Donuts of Am., Inc.*

*v. Minerva, Inc.*, 956 F.2d 1566, 1571–72 (11th Cir. 1992) (citing *Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976)) (considering "the effect of continued performance after a material breach").

 The facts do not support Timberline's argument that APTIM breached the Timberline Subcontract by failing to give Timberline additional time to perform. On May 6, 2023, Timberline notified APTIM of "potential delays in the schedule due to unforeseen conditions." (Doc. 136-8 at 1.) But at that time, Timberline merely reserved its right to seek an extension for performance. (*Id.* at 1–2.) It also informed APTIM that it would "diligently seek to minimize . . . the effects of these delays on [its] work." (*Id.* at 2.) Then, in its second corrective action plan—sent to APTIM on June 9, 2023—Timberline assured APTIM that it "ha[d] the resources, skilled trades, and management" to perform "in accordance with the plans and specifications *and within the contract period of performance*." (Doc. 136-20 at 3 (emphasis added).) While Timberline pointed to "delays beyond [its] control," it concluded the document by again insisting that it "c[ould] complete th[e] work as required by the plans and specifications *and within the required timeline*." (*Id.* at 4 (emphasis added).) Consequently, Timberline has not shown whether or how APTIM breached first. Relatedly, Timberline has not shown that it regarded APTIM as having materially breached—or that Timberline did not waive this excuse by continuing to perform.

       c. <u>Notice & Opportunity to Cure</u>

 Timberline posits that Section 11 of the Timberline Subcontract circumscribes APTIM's "sole discretion," *viz.*, by entitling Timberline to an opportunity to cure. (*See* Doc. 134 at 14–15.) Preliminarily, the Court notes that it doubts Timberline's interpretation.[5] Section 11 provides:

---

[5] Even if Timberline is correct that Section 11 of the Timberline Subcontract circumscribed Section 25 by entitling Timberline to an opportunity to cure, the plain language of Section 11 also establishes that the cure period started when Timberline "discover[ed] defective work." (*See* Doc. 118-4 at 50; *see also* Doc. 139 at 7–8.) Crucially, Section

> [Timberline] shall, within 24 hours of discovering defective work or after receiving notice from [APTIM], proceed to take down and remove all portions of the Subcontract Work which shall have been determined to have been defective and shall replace same with proper and satisfactory Subcontract Work, and shall make good all work damaged or destroyed thereby.

(Doc. 118-4 at 50.) Plainly, this section required that Timberline begin remediating defective work within 24 hours of discovery or notice thereof. (*See id.*) But it does not follow that this section qualified APTIM's ability to terminate the Timberline Subcontract under Section 25. (*See id.* at 58 ("If, in [APTIM's] sole discretion, . . . [Timberline] [wa]s refusing or failing to perform properly any Subcontract Work . . . , [APTIM could] . . . terminate [the Timberline] Subcontract . . . by issuance of a written termination notice to [Timberline]."); *see also id.* at 50 (warranting that Timberline's work would be "free from defects and deficiencies").) Indeed, such an interpretation would seem to negate the broad latitude afforded APTIM under that section. *See also Pierce Law Grp.*, 408 So. 3d at 151 ("Where the contract is susceptible to an interpretation that gives effect to all of its provisions, the court should select that interpretation over an alternative interpretation that relies on negation of some of the contractual provisions." (quoting *Siegle*, 819 So. 2d at 739)).

Perhaps for this reason, Timberline primarily argues that, regardless of the terms of the Timberline Subcontract, it had an *implied* right to adequate notice and a reasonable opportunity to cure. (*See* Doc. 134 at 8–9 (citing 7 *Bruner & O'Connor on Construction Law* § 18:39 (2024)).) Worth noting, Timberline cites virtually no caselaw in support of this position. (*See, e.g.*, *id.* at 8–10, 13–14.) *But see Centerplan Constr. Co.*, 343 Conn. at 412–13 (citing, *inter alia*, *Fraunhofer-Gesellschaft zur Förderung der Angewandten Forschung E.V. v. Sirius XM Radio, Inc.*, 940 F.3d

---

11 did not specify a cure period. (*See* Doc. 118-4 at 50.) It merely provided that Timberline would begin remediating defective work within 24 hours of discovery or notice thereof. (*Id.*) Thus, what constituted a "reasonable" opportunity to cure would seem to have been left up to APTIM. (*See id.* at 58.) Timberline's Daily Reports reflect that, at a minimum, Timberline had four days—from June 21 through June 24, 2023—in which to cure sewer system defects. (Doc. 118-7 at 54, 70, 105, 109, 157, 186.) Especially given the abbreviated schedule for the Project, (Doc. 136-4 at 2), Timberline has not raised a genuine issue whether APTIM breached the implied covenant of good faith and fair dealing by failing to give Timberline a reasonable opportunity to cure.

1372, 1379 (Fed. Cir. 2019)) ("[S]ilence in a contract regarding notice and cure rights . . . supports a presumption in favor of common-law notice and cure rights . . . ."); *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn. App. 1990) (citing *United States ex rel. Cortolano & Barone, Inc. v. Morano Constr. Corp.*, 724 F. Supp. 88, 98 (S.D.N.Y. 1989); *Cyclo Floor Mach. Corp. v. Nat'l Housewares, Inc.*, 296 F. Supp. 665, 682 (D. Utah 1968)) ("[E]ven when the parties have not included a 'take over' clause in their contract, courts have imposed upon contractors the duty to give subcontractors notice and an opportunity to cure before terminating the contract for faulty performance."). And conspicuously, the cases which Timberline *does* cite do not concern Florida law,[6] even though the parties agree that Florida law governs the Timberline Subcontract. (*See* Doc. 134 at 8–10, 13–14; *see also* Doc. 118-2 at 7.)

But even assuming, *arguendo*, that Timberline was entitled to adequate notice, as well as a reasonable opportunity to cure, there is no genuine issue that it received both. On June 8, 2023, APTIM issued its second cure notice to Timberline. (Doc. 118-7 at 19–20.) This notice was in writing, identified itself as a cure notice, and specified instances of Timberline's defective work on the sewer system, including during Lee County's visit on June 1, 2023. (*Id.*) The notice also warned that "**[a] single additional instance of re-work caused by Timberline's inability to construct accurately and in accordance with specifications and schedule w[ould] result in**

---

[6] Timberline points to *MV Lady B, LLC v. Rolly Marine Service Co.* (*See* Doc. 134 at 9 (citing *MV Lady B*, 2024 WL 4881034, at *3–4).) In *MV Lady B*, the district court observed that "[c]ourts overwhelmingly disfavor reading implied terms into . . . contract[s]." *MV Lady B*, 2024 WL 4881034, at *3 (citing *Hughes v. S.W. Airlines Co.*, 961 F.3d 986, 989–90 (7th Cir. 2020)). It added that courts have "specifically declined to infer a right to cure default or breach." *Id.* (citing *Al Owaidah v. Mazzei*, No. 18-246, 2020 WL 1041091, at *12 (C.D. Cal. Jan. 27, 2020); *Aurora Loan Servs. LLC v. NGBI, Inc.*, No. 7-6501, 2009 WL 10670622, at *11 (C.D. Cal. Apr. 27, 2009)). Because the defendant in *MV Lady B* relied on the same cases which Timberline now cites, the court concluded that, "*[a]t most*, the . . . cases support the proposition that there is an implied right to cure in construction contracts." *Id.* (emphasis added) (citing *Gray Constr., Inc. v. Medline Indus., Inc.*, No. 19-3405, 2023 WL 2333218, at *13 (D. Md. Mar. 1, 2023)). But this statement is hardly even dictum. The court was not considering whether there is, in fact, an implied right to cure in construction contracts. *See id.* at *4. Rather, it was explaining that it did not need to consider whether the cases which the defendant had cited accurately reflected Florida law, because the cases themselves were inapposite. *See id.* For its part, this Court is unaware of any Florida case implying a right to adequate notice and an opportunity to cure, particularly where the underlying question is whether a party breached the implied covenant of good faith and fair dealing.

**immediate termination for default**." (*Id.* at 20 (emphasis in original).) Subsequently, the sewer system failed the multiple pressure tests performed by Lee County. (Doc. 118-10 at 12–13.) Timberline was present for these failed pressure tests. (*Id.* at 13.) Additionally, Timberline noted in its Daily Reports that it was finding and repairing sewer leaks from June 21 through June 24, 2023. (Doc. 118-7 at 54, 70, 105, 109, 157, 186.) "At the time Timberline was terminated, Lee County had not accepted any of the work performed *by Timberline* on the sewer lines." (Doc. 118-1 at 8, ¶ 40 (emphasis added).) On June 23, 2023, APTIM informed Timberline via the "Notification of Breach of Contract" that Timberline's performance "ha[d] resulted in a delay which forecast[] [late] completion of the [P]rime [C]ontract . . . and therefore [wa]s in breach."[7] (Doc. 118-7 at 190.) The June 27 "Notice of Termination for Default" likewise stated that APTIM was terminating Timberline "for the continued performance and schedule issues addressed with Timberline" via on-site meetings and correspondence (e.g., the June 8 cure notice). (*Id.* at 192.)

Given the June 8 cure notice, the Court need not consider whether other notices to Timberline were adequate. (*See* Doc. 139 at 7–9 (citing Doc. 118-7 at 19–20).) The Court notes, however, that Timberline has not provided any support for its argument that, even where notice is merely implied, it must take a specific form. (*See* Doc. 134 at 13–14, 18–19 (citing *Eddystone*, 2015 WL 1542284, at *8 (dealing with a contract provision requiring specific written notice)).) And other cases have held that even a contractual requirement that one party deliver notice in writing "may be waived when 'the consistent actions of the two parties' lead to . . . [the] conclusion" that the party entitled to notice "was aware of the delays and their cause" and "had the opportunity to ascertain the facts surrounding the delays." *Parkcrest Builders*, 2017 WL

---

[7] Contrary to Timberline's assertion, the "Notification of Breach of Contract" was not limited to "schedule and delays." (*See* Doc. 134 at 23–24.) Rather, the document explained that Timberline's defective work had *caused* delays. (*See* Doc. 118-7 at 190.) Other documents (e.g., the June 8 cure notice, the "Notice of Termination for Default") also make clear that defective work could be and was a basis for termination. (*See, e.g.*, *id.* at 19–20.)

3394033, at *5 (quoting *Nat Harrison Assocs., Inc. v. Gulf States Utils. Co.*, 491 F.2d 578, 583 (5th Cir. 1974)); *see also Fort Walton Beach Lincoln-Mercury, Inc. v. Pearson*, 731 So. 2d 859, 860 (Fla. 1st DCA 1999) (finding that, although the management agreement required written notice of termination, plaintiff waived this requirement by his conduct and by failing to raise the issue of written notice until suit was filed); *id.* at 860 n.2 (collecting cases).

In *Parkcrest Builders, LLC v. Housing Authority of New Orleans*, for example, the court found that the defendant waived notice because it "was aware of the problems with the electrical grid . . . and was reminded of these problems on a weekly basis during . . . progress meetings." 2017 WL 3394033, at *5. Likewise, in the instant case, Timberline was aware of the defective work—through complaints by the USACE, through the cure notices sent by APTIM, through regular on-site meetings and other verbal communications, through its presence during the multiple failed pressure tests performed by Lee County, and through its own work on the sewer system, documented in its Daily Reports. (*See, e.g.*, Doc. 118-2. at 16–17; *see also id.* at 17–18 (citing, *inter alia*, Doc. 118-12 at 2–3; 118-7 at 11–15); Doc. 118-1 at 8, ¶ 41.) And after receiving the June 8 cure notice, Timberline was aware that APTIM was considering termination for additional re-work necessitated by defective work. (*See* Doc. 118-7 at 19–20.)

Timberline argues that it cured all instances of defective work identified by APTIM in the June 8 cure notice, citing APTIM's corporate deposition as support. (Doc. 134 at 15 (citing Doc. 136-32 at 9–18).) But APTIM's corporate representative testified that, while Timberline's re-work passed *visual* inspection and was accepted by APTIM "*[i]n that particular phase of work*," the sewer system "ultimately require[d] testing" for defects which "[we]re not verifiable by visual means." (Doc. 136-32 at 15–16 (emphasis added).) For example, while Timberline's re-work between manholes 7 and 8 "met a visual standard," it "was not mechanically tested[,] so it was not

accepted." (*Id.* at 16–17.) The same was true of the ten sewer laterals which Timberline installed incorrectly and which had to be re-installed. (*Id.* at 17–18.) APTIM's corporate representative was adamant that passing mechanical testing "was required prior to any of the [sewer] system being accepted." (*Id.* at 17; *see also id.* ("[I]t's a function of final acceptance.").) Thus, the fact that Timberline's re-work passed visual inspection does not mean that Timberline cured the defects identified, nor does it mean that APTIM deemed all defects to have been cured.[8]

Even if the Court accepts Timberline's argument that it was entitled to notice and an opportunity to cure, it rejects Timberline's position that the sewer leaks in late-June were *new* defects for which APTIM needed to provide additional, specific notice and an opportunity to cure. The sewer leaks were part of a continuum of defective work performed on the sewer system. (*See also* Doc. 139 at 8 (regarding the June 8 cure notice as providing "two weeks for Timberline to address the identified defects" with the sewer system); *see also id.* at 5 n.20 (denying that the defects "'discovered' on June 24, 2023" were "isolated issues," instead describing them as "continued defects that Timberline consistently failed to fix"); Doc. 136-32 at 15–18 (explaining that, while Timberline's re-work passed visual inspection, mechanical testing "was required prior to any of the [sewer] system being accepted").) And Timberline was aware of these continued defects, as evidenced by the Lee County inspector's testimony, (Doc. 118-10 at 13), and by Timberline's own Daily Reports, (Doc. 118-7 at 54, 70, 105, 109, 157, 186). Given all of the above,

---

[8] The Court has carefully reviewed the other deposition testimony cited by Timberline in support of its related contention that it "cured or attempted to cure *all* quality workmanship issues promptly." (*See* Doc. 134 at 15 (citing Doc. 136-41 at 3–4; Doc. 136-39 at 5–6; Doc. 136-37 at 3–4).) Two of these deposition excerpts are unequivocal that Timberline performed defective work and that at least some of this defective work *could not be cured quickly, if at all.* (*See* Doc. 136-41 at 3–4; Doc. 136-39 at 5–6.) The other deposition acknowledges that Timberline made "mistakes" while working on the sewer, although it explains that these mistakes "were caught fairly early, and so . . . adjustments were made early on." (Doc. 136-37 at 3–4.) None of these depositions establishes that Timberline cured all defective work on the sewer or—more to the point—that it was deprived of a reasonable opportunity to do so.

Timberline has not raised a genuine issue whether APTIM provided adequate notice and a reasonable opportunity to cure.

d.  Whether APTIM Terminated Timberline in Bad Faith

Finally, Timberline straightforwardly argues that APTIM terminated Timberline in bad faith—specifically, that APTIM used Timberline "as a scapegoat" in order to "place itself back in [the] USACE's good graces after its own poor management of the Project." (Doc. 134 at 24–25.) Notably, an ulterior motive for termination does not, *ipso facto*, establish breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Avatar Dev. Corp.*, 834 So. 2d at 876 ("Avatar's ulterior motive for De Pani's termination has no relevance[,] as Article 67 of the Master Contract provided Avatar with the right to terminate De Pani at any time. Florida law required nothing more of Avatar." (internal citation omitted)). Again, Timberline must show that a reasonable trier of fact could find that "no reasonable party" would have terminated the Timberline Subcontract under the circumstances. *See Ernie Haire Ford*, 260 F.3d at 1291. As discussed above, it has failed to do so.

But even assuming that Timberline's "scapegoat" argument independently raises concerns over APTIM's good faith, the facts are not on Timberline's side. Timberline quotes a June 29 e-mail from BAJV's responsible manager to suggest that APTIM terminated Timberline in order to redeem BAJV in the eyes of the USACE. (*See* Doc. 134 at 25 (quoting Doc. 136-26 at 1).) The quote—"[W]e are about to have used up our one and only chance at redemption on this project . . . ."—has been selectively edited. (*See* Doc. 136-26 at 1 (emphasis omitted).) The full sentence reads: "I will tell everyone right now that we are about to have used up our one and only chance at redemption on this project by not having any accountability on all these ancillary items *that apparently we ignored while our field team was engrossed in the failures of Timberline on site*." (*Id.* (cleaned up).) Preceding sentences are similarly unequivocal: Timberline dropped the ball, at

least from APTIM's perspective. (*See id.* ("What is the purpose of a team having a full [quality control] group if nobody is holding our sub[contractor] accountable . . . ? Did no one ever follow up and ask Timberline to provide proof that they were actually doing anything? . . . Or did we just take them for [sic] their word after they did nothing to prove [that] they provided a truthful statement on status? . . .").)

Timberline also quotes a July 5 e-mail from BAJV's responsible manager, this time in full. (Doc. 134 at 25 (quoting Doc. 136-27 at 1).) But that e-mail likewise suggests that APTIM believed that Timberline had performed defective work. (*See* Doc. 136-27 at 1.) Specifically, BAJV's responsible manager wrote:

> At this point, we had our free pass to remove Timberline and make good, but that card is now 3/4 out the window. The next to come is going to be a full deficiency in the [quality control] on the project[,] as there are no more [subcontractors] to pass blame on, *plus in my opinion we didn't respond strong enough, especially with all the continued repairs that are showing up*.

(*Id.* (emphasis added).) At most, these e-mails indicate that Timberline performed defective work *and* that BAJV was itself performing poorly (i.e., under the Prime Contract). Both things can be true, however. These e-mails do not alter the finding of APTIM's good faith.

As discussed above, the Timberline Subcontract empowered APTIM to determine, in its sole discretion, whether Timberline's work was defective and, if so, to terminate the Timberline Subcontract by written notice to Timberline. Timberline does not dispute that it performed defective work on the sewer system, that it received a formal cure notice on June 8, 2023, and that issues with the sewer system continued to manifest afterward. It admits that it was on site when the Lee County inspector performed multiple pressure tests, that those pressure tests failed, and that from June 21 through June 24, 2023, it noted in its Daily Reports that it was finding and

repairing sewer leaks. At the time Timberline was terminated, Lee County had not accepted any of the work performed on the sewer system by Timberline.

APTIM terminated Timberline via e-mail on June 25, 2023, followed by formal notice on June 27, 2023. That formal notice identified Timberline's performance as a reason for termination. Thus, Timberline has not raised a genuine issue whether it received adequate notice and a reasonable opportunity to cure or whether APTIM properly terminated the Timberline Subcontract. Likewise, it has not shown that a reasonable trier of fact could find that APTIM breached the implied covenant of good faith and fair dealing—that is, that APTIM acted capriciously—when it determined, in its sole discretion, that Timberline had performed defective work. Because, for the above reasons, no reasonable trier of fact could find that APTIM terminated the Timberline Subcontract in bad faith, the Court need not reach the other bases for termination identified by APTIM (e.g., unsafe, unskilled work and the failure to procure a bond).

V.     CONCLUSION

Accordingly,

**IT IS ORDERED** that APTIM's *Motion for Partial Summary Judgment* (Doc. 118) is **GRANTED**. The Court finds that (a) APTIM did not breach the implied covenant of good faith and fair dealing and (b) APTIM properly terminated the Timberline Subcontract.

Signed in Baton Rouge, Louisiana, on <u>February 4, 2026</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

44